## State of Vermont v. Louis A. Hamlin III

[499 A.2d 45]

No. 82-339

Present: **Billings, C.J., Hill, Underwood, Peck and Gibson, JJ.**

Opinion Filed July 5, 1985

Motion for Reargument Denied August 15, 1985

98

*Susan L. Fowler*, Chief Deputy State's Attorney, and *James Carroll*, Law Clerk (On the Brief), Burlington, for Plaintiff-Appellee.

*Christopher L. Davis* and *Robin M. McCormick* (On the Brief) of *Gear and Davis, Inc.*, Burlington, and *Valsangiacomo, Detora & McQuesten, P.C.*, Barre, for Defendant-Appellant.

**Peck, J.** Defendant appeals his convictions of first degree murder and aggravated sexual assault following a jury trial in Windsor Superior Court. He also appeals the sentence he received on the charge of first degree murder. We affirm.

On May 15, 1981, the defendant, then sixteen years old, and a fifteen-year-old companion seized two girls, ages twelve and thirteen, as the girls walked through a wooded shortcut on their way home from school. The defendant and his friend covered the girls' mouths and dragged them off the path and into the woods. The two boys had BB guns and told the girls to keep quiet or they would be shot.

The defendant began choking the thirteen-year-old girl, forcibly removed her clothes, and attempted both vaginal and anal intercourse. He shot a BB or pellet into the back of the twelve-year-old as she lay on the ground, and stomped on her back with his boot. The defendant said to the thirteen-year-old girl, "Now you are going to know what it's like to be slaughtered like a pig and shot five times." The girls were then dragged to another spot in the woods where they were gagged and their arms bound. The defendant shot the thirteen-year-old in the side of the neck with a BB gun, and she heard him ask, "Where's the knife?" She felt a sharp pain in her back but was unable to see who inflicted it; shortly thereafter she lost consciousness. During these events, the defendant's companion had also participated in physical and sexual assaults upon both girls.

When the older girl recovered consciousness, she was bleeding, still unclothed, and still bound and gagged; her assailants had gone. She was not able to locate her twelve-year-old friend, so she walked down a path and was discovered by an employee of the Central Vermont Railway and rushed to the Medical Center Hospital of Vermont. After a brief search of the wooded area, police officers found the lifeless body of the twelve-year-old girl still bound and gagged.

An autopsy on the body of the murdered child disclosed evidence of choking, blunt impact injuries, BB-type gunshot wounds, at least five stab wounds, and shallow incisions characterized by the state medical examiner as "teasing wounds." The medical examiner determined the cause of death to be a stab wound to the left chest which punctured the heart.

On May 20, 1981, the thirteen-year-old girl identified photographs of the defendant and his younger companion as the attackers. Both were arrested in the early morning of May 21, 1981. The defendant was charged with first degree murder and aggravated sexual assault. His companion could not be charged in the criminal courts because he was under the age of sixteen; juvenile delinquency proceedings were instituted against him.

At trial, four witnesses testified to admissions made by the defendant. About a week after the death of the younger girl, the defendant and his companion met two young women with whom they were acquainted. The conversation turned to the subject of the killing. Both women testified that the defendant said, "Actually, we did it," referring to the killing. His companion admonished the defendant to keep quiet.

In August of 1981, the defendant was incarcerated in the maximum security wing of the St. Albans Correctional Center. A guard testified at trial that he heard the defendant tell another inmate that, "I killed the girl. I figure I owe 10 years. I'm going to tell the judge I owe 10 years, and that's all I'm going to serve." Further, an inmate of the correctional center testified that he overheard the defendant tell another inmate that he, the defendant, had killed a girl; that he stabbed her in the chest twice and in the back once. The inmate further testified that he heard the defendant say that he shot his victim and that he would kill his companion for "ratting him out."

The facts summarized are descriptive of the general events which form the basis for the charges of first degree murder and

sexual assault. Subsequent sections of this opinion will supplement these facts with the additional facts underlying defendant's specific claims of error.

## I.

Defendant contends that during closing argument the state's attorney made an impermissible comment on his decision not to testify at trial. He argues that this constituted a violation of his privilege against compelled self-incrimination guaranteed by the Fifth Amendment to the United States Constitution.

During the State's rebuttal argument, the state's attorney addressed the jury as follows:

> We did a very unusual thing in this case. Very unusual thing. We don't often do that in criminal cases. We proved the defense attorney was wrong and we proved the defendant was right. The reason I say that is because Louie as he sits here knows he's guilty. He's sitting right here, he knows he's guilty. And the reason why Louie knows he's guilty is because he said that. When Lori Comstock and Evelyn were there on the bridge, what did Louie say? Actually we did it and laughed. *Right, Louie?* And then—(emphasis added).

Defendant's counsel promptly objected to the language emphasized above; the prosecutor apologized to the court and the jury; and the court immediately admonished the jury to "completely disregard that and put it completely out of its mind."

During an in-chambers conference following closing arguments the defendant moved for a mistrial or, if that motion was denied, for curative instructions. The court denied the motion for mistrial. Nevertheless, in its charge to the jury, the court referred to the state's attorney's remark, admonished him, then questioned the jury directly as to their ability to disregard the remark. The court then asked that if any juror had any reservation as to his ability to disregard the remark "will you please raise your hand at this time." The record indicates that no juror raised a hand. The court then concluded this phase of the charge: "And so I say to you, and I must re-emphasize because of the unfortunate error . . . that defendant . . . has not taken the stand to testify, and in no way are you to infer his guilt or even discuss that fact within the jury room."

After the jury returned guilty verdicts on both charges, the defendant filed a motion for a new trial. One of the grounds stated for the motion was the trial court's failure to grant defendant's motion for a mistrial based on the state's attorney's alleged improper comment on defendant's Fifth Amendment right to remain silent. After a hearing, the court denied the motion for a new trial.

In stating its reasons for denying the defense motion for a new trial, the court indicated that, based on its recollection, the prosecutor did not physically point at defendant nor did he lean over defendant or act in any menacing manner toward the defendant at the time the "Right, Louie" statement was made.

The defendant appeals the court's denial of the motion for a new trial.

A question involving the Fifth Amendment raises an issue of federal law. Therefore, it requires us to analyze the alleged error in light of the relevant decisions of the United States Supreme Court. *State* v. *Badger*, 141 Vt. 430, 438, 450 A.2d 336, 341 (1982). Thus, in reviewing a claim of error under the Fifth Amendment we place ourselves in the position of a federal court of appeals. *Id.*

In *United States* v. *Hasting*, 461 U.S. 499 (1983), the Court considered a situation where, in summation before the jury, the prosecutor commented on the fact that the defendants never presented any evidence. *Id.* at 502. The United States Court of Appeals for the Seventh Circuit had reversed the convictions, because of what it perceived as a Fifth Amendment violation, and remanded the case for a new trial. 660 F.2d 301, 303 (7th Cir. 1981). The United States Supreme Court never expressly indicated whether or not the prosecutor's comments violated the defendant's Fifth Amendment rights as set forth in earlier cases, see *Griffin* v. *California*, 380 U.S. 609 (1965), but applied the harmless error doctrine announced in *Chapman* v. *California*, 386 U.S. 18, 24 (1967), and *Hasting, supra*, at 510-12.

*Griffin* and *Chapman* both involved direct and unequivocal comments on defendants' failure to testify. The comments in *Hasting*, like the prosecutor's remark in the instant case, were more equivocal to the extent they were not direct in referring to failures to testify. However, both parties agree that the first issue is whether or not the remark "Right, Louie?" constituted an improper comment on the defendant's right to remain silent.

## A.

■ The test for evaluating alleged comments on a defendant's failure to testify, adopted by the overwhelming majority of federal circuit courts of appeals, considers whether the remark was manifestly intended to be, or was of such a character that the jury would naturally and necessarily take it to be, a comment on the defendant's failure to testify. See, e.g., *Hearn* v. *Mintzes*, 708 F.2d 1072 (6th Cir. 1983); *United States* v. *Hartley*, 678 F.2d 961 (11th Cir. 1982), *cert. denied*, 459 U.S. 1170 (1983). We have recognized this as the appropriate test for analyzing whether a prosecutor's remarks infringed upon defendant's Fifth Amendment privilege against self-incrimination. *State* v. *Kasper*, 137 Vt. 184, 209, 404 A.2d 85, 99 (1979).

■ The facts of this case indicate that the state's attorney was in the process of summarizing the admission testimony of several witnesses at the time he made the comment, "Right, Louie?". The state's attorney was reiterating the testimony of the two women who had taken the witness stand and testified that the defendant said, "we did it." Then the question, "Right, Louie?" was interjected. The record indicates that the state's attorney was already proceeding to reiterate the other admission testimony. The record also indicates that the state's attorney immediately and repeatedly apologized to both the court and the jury. As soon as these apologies were made, he indeed moved on to address the other admission testimony. It appears to us that the question, "Right, Louie?" was a spontaneous and inadvertent slip during the prosecutor's summation of some of the State's most damaging evidence. We do not think it was manifestly intended to be a comment on the defendant's failure to testify. Thus, the first part of the test is not met. *State* v. *Kasper, supra*.

Next, we must consider whether the question was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. As noted above, technically, this was not a direct comment on defendant's failure to testify, but it was a question directed to the defendant.

■ When reviewing a claim that there was a comment on the defendant's failure to testify, we will look to the entire context in which the comment occurred. *United States* v. *Young*, 470 U.S. 1, 11, 105 S. Ct. 1038, 1044 (1985); *Williams* v. *Wainwright*, 673

F.2d 1182, 1184 (11th Cir. 1982); *United States* v. *Jones*, 648 F.2d 215, 218 (5th Cir. 1981).

 The facts indicate that when the comment was made, the defendant was seated next to his counsel. The state's attorney was somewhere near counsel table, but the court stated on the record that he did not lean over the table or hover over the defendant or act in any menacing way toward the defendant. Considering the context and the physical environment in which the question was asked, we think that it "was a simple rhetorical question calling attention to an inference which could fairly be drawn from the evidence before the jury." *United States* v. *Alessi*, 638 F.2d 466, 481 (2d Cir. 1980); accord *United States* v. *Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977). We do not believe that the jury would naturally and necessarily conclude that the prosecutor's question and the lack of a response by the defendant amounted to a comment upon his failure to testify. Cf. *Bird* v. *State*, 527 S.W.2d 891, 895 (Tex. Crim. App. 1975) (holding prosecutor's comment in that case would "naturally and necessarily" be taken as a comment on defendant's failure to testify).

Even though we have determined that, in our view, the remark did not amount to a comment on defendant's Fifth Amendment right not to testify, this is, nevertheless, a question of federal law, *Badger, supra*, 141 Vt. at 438, 450 A.2d at 341. Therefore, assuming, for the purposes of this opinion, that the remark did constitute a comment on defendant's right not to testify, we will address the issues of the trial court's curative instructions and the federal harmless error rule.

## B.

The record indicates that the trial court twice addressed the jury regarding the prosecutor's comment. Immediately following the comment and defendant's objection thereto, the court said, "Just a minute. The jury will completely disregard that and put it completely out of its mind . . . ." There was no reference to the defendant's failure to testify at that time.

During its charge to the jury, and at the request of the defendant, the court gave detailed instructions on the right of the defendant not to take the stand. The court referred to the remark by the state's attorney, admonished him for it, and polled the jury on the question of whether they could disregard the com-

ment. Our review of the record convinces us that the trial judge did as much to cure any error resulting from the remark as could have been done. The question, then, assuming there was a comment on defendant's failure to testify, is whether such an error can ever be cured by a trial judge. None of the three decisions of the United States Supreme Court cited above, *Griffin, Chapman,* or *Hasting,* addressed the question of curative instructions in situations such as this. Several circuit courts of appeal, however, have addressed the issue.

In *Samuels* v. *United States,* 398 F.2d 964, 969 (5th Cir. 1968), *cert. denied,* 393 U.S. 1021 (1969), the court held that "[t]he comment here under attack was unexceptional and wholly lacking in aggravation and emphasis. The facts and circumstances of this case present a typical example of the kind of case where prompt objections and curative instructions have their highest and best use." In the instant case, there was just such a prompt instruction by the trial judge. Similarly, in *United States* v. *Heller,* 625 F.2d 594, 600 (5th Cir. 1980), the court held that a prompt curative instruction was sufficient to remedy any alleged improper comment on the defendant's right not to testify.

Furthermore, courts have held that curative instructions in the final charge to the jury may be sufficient to remedy any alleged error. *United States* v. *Wilkins,* 659 F.2d 769, 774 (7th Cir.), *cert. denied,* 454 U.S. 1102 (1981); *United States* v. *McCoy,* 539 F.2d 1050, 1058 (5th Cir. 1976), *cert. denied,* 431 U.S. 919 (1977); see also *United States* v. *Harbin,* 601 F.2d 773, 777 (5th Cir.), *cert. denied,* 444 U.S. 954 (1979).

In the instant case, the trial judge instructed the jury both at the time of the remark and again in the final instructions. We think the curative instructions given below were more than sufficient to cure any possible error.

## C.

Finally, we address the question of harmless error. Since we are reviewing an issue of federal law, we apply the federal harmless error rule, rather than our own rule in V.R.Cr.P. 52(a).[1] *Chapman, supra,* 386 U.S. at 24; *Badger, supra,* 141 Vt. at 438, 450 A.2d at 341. The necessity of undertaking harmless error

---

[1] This Court has recognized and approved the harmless error rule as set forth in *Hasting.* See *State* v. *Nash,* 144 Vt. 427, 434, 479 A.2d 757, 761 (1984).

analysis on federal issues was emphasized in *United States* v. *Hasting, supra*. Thus, we will proceed with a harmless error analysis, assuming again that there was a comment on the defendant's failure to testify and that this error was not cured by the trial court's instructions to the jury.

■ First, we must distinguish the concept of harmless error from that of curative instructions. Harmless error analysis requires the reviewing court to inquire if, absent the alleged error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the error. *Hasting, supra*, 461 U.S. at 510-11; see also *Chapman, supra*, 386 U.S. at 24. Thus, analysis under the harmless error doctrine focuses on the evidence of guilt present in the record. An analysis of curative instructions, on the other hand, focuses on diminishing the harmful effect of the error itself.

■ Any error in the remark "Right, Louie?" was harmless when considered in light of the testimony of the thirteen-year-old girl that the defendant asked his companion for a knife, that he violently assaulted the deceased at least twice, once with his boot and once with a BB gun, and that he said to the survivor, "Now you are going to know what it's like to be slaughtered like a pig and shot five times," and the testimony of four admission witnesses that on three different occasions the defendant said he killed the girl. It is clear beyond a reasonable doubt that the jury would have returned a guilty verdict regardless of the prosecutor's challenged remark.

## II.

Defendant claims next that the court erred in refusing to order the State to grant witness immunity to defendant's companion, or to grant the companion a judicially fashioned witness immunity.

Underlying this claim of error is defendant's request that his companion be granted immunity in the hope or expectation the latter would testify that he, and not defendant, inflicted the fatal stab wound on the murdered girl. The companion made numerous and often conflicting statements about the murder and sexual assaults upon which the charges against the defendant were based. Originally, the companion placed most of the blame on the defendant, but thereafter he began to claim a greater responsibility for the fatal stabbing.

The companion acknowledged freely and repeatedly that he had lied under oath and, even more significantly, that he felt lying was acceptable conduct. He admitted to lying during his sworn statements and during his depositions. In a chambers conference, the trial court summarized the situation: "[the companion] has made statements that are both exculpatory and inculpatory of Mr. Hamlin. I don't think there is one person in this room that knows what [the companion] would say if he got on that stand . . . ."

At trial, defendant called the companion as a witness, but he refused to testify, asserting his Fifth Amendment privilege against self-incrimination. The State argues that it failed to call the companion as a witness and refused to grant him immunity under 12 V.S.A. § 1664 because, (1) the Attorney General was, at that time, investigating the possibility of perjury charges against him (he was, by then, sixteen years of age),[2] and (2) the State did not want to place an admitted perjurer before the jury.

Under the controlling Vermont statute, 12 V.S.A. § 1664, the power to grant witness immunity, or to request a court order requiring a witness to testify subject to such immunity, vests exclusively within the discretion of the Attorney General and the state's attorneys, not in the courts. However, relying primarily on *Government of the Virgin Islands* v. *Smith*, 615 F.2d 964 (3d Cir. 1980), defendant argues that the court can order a prosecutor to grant immunity to a defense witness if the defendant can show that the prosecutor's refusal to do so was "made with the deliberate intention of distorting the judicial fact finding process."[3] *Id.* at 968 (quoting *United States* v. *Herman*, 589 F.2d 1191, 1204 (3d Cir. 1978), *cert. denied*, 441 U.S. 913 (1979)). Secondly, again citing *Smith*, defendant argues that courts have an inherent

[2] In January of 1983 the Attorney General concluded that the companion could not be prosecuted successfully under Vermont perjury laws as they existed at that time.

[3] Defendant has also briefed an argument that defendant did not commit the acts underlying his convictions; he claims that the convictions were the result of alleged prosecutorial negligence and misconduct. However, defendant has failed to point to any error by the court below in this regard. Instead, we are presented with a long narrative on the facts as defendant would have us believe them, and facts which defendant argues should have led to a wholly different investigation and theory by the State. Under these circumstances, we decline to address this argument further except to the extent that portions of this argument are addressed in this section and the next section of the opinion.

power to grant immunity. This form of immunity is not triggered by prosecutorial misconduct, "but by the fact that the defendant is prevented from presenting exculpatory evidence which is crucial to his case." *Id.* at 969.

We note that the holdings in *Smith* are in a distinct minority. See *United States* v. *Turkish*, 623 F.2d 769, 772-73 (2d Cir. 1980), *cert. denied*, 449 U.S. 1077 (1981) (defense witness immunity rejected by almost all federal circuit courts which have considered the issue). Nevertheless, it is unnecessary to resolve the issue at this time, and we decline to do so. Defendant has not satisfied us that the State's decision against granting or requesting witness immunity for his companion was "made with the deliberate intention of distorting the fact finding process." *Smith, supra*, at 968.

Similarly, defendant does not make a "convincing showing" that the testimony of the companion would be "clearly exculpatory." *Id.* at 972. It appears only that prior statements and testimony are contradictory. As the trial court observed, nobody knew what the companion might say on the witness stand. We conclude that the facts of this case do not fall within the minority guidelines set forth in *Smith, supra*. Accordingly, there is no need to pass on the applicability of that case in Vermont. Defendant has not demonstrated any error involving the immunity issue and we find none.

## III.

Defendant next contends the court erred in refusing to decide whether the results of a polygraph test of defendant's companion were admissible at trial. Further defendant argues that if the court had exercised its discretion it should have admitted the results.

In a hearing on the State's motion to exclude the polygraph evidence, the court said:

> It would be something more than a major stroke in terms of stare decisis and in terms of innovation in our criminal law if this Judge on his own decided to admit polygraph evidence. I think, if the breakthrough should come, it should come from the highest court and not from the trial court.

In other words, the court decided not to decide.

Assuming, *arguendo*, the court could have reached the admissibility question, defendant's claim has no force in this case because there was no foundation for the admissibility of the evidence. *State* v. *Bourassa*, 137 Vt. 62, 67, 399 A.2d 507, 511 (1979); *United States* v. *Wainwright*, 413 F.2d 796, 803 (10th Cir. 1969), *cert. denied*, 396 U.S. 1009 (1970); *United States* v. *Russo*, 527 F.2d 1051, 1058-59 (10th Cir. 1975), *cert. denied*, 426 U.S. 906 (1976). As noted in *Wainwright, supra*, "no judgment can be made without relevant expert testimony relating to the probative value of such [polygraph] evidence." Defendant's attorney merely stated for the record an offer of proof that he would have presented the polygraph examiner who would testify as to the results of the test. Thus, defendant:

> totally failed to supply the condition noted by Wigmore that before such evidence be admitted an expert testify "that the proposed test is an accepted one in his profession and that it has a reasonable measure of precision in its indications." 3 Wigmore on Evidence (3rd Ed. 1940) § 990.

*Id.*

Thus, regardless of whether a trial court has discretion to admit polygraph examination results,[4] the defendant failed to lay the proper foundation. There was never a hearing requested on the examiner's qualifications, on the reliability of polygraph tests in general, or on the appropriateness of the companion as a subject.

We find no error in the trial court's decision not to admit the results of the polygraph test. We leave open the broader questions concerning the proper standard for disposing of such issues—the scientific reliability of polygraph tests, the qualifications of the examiner, and the wide range of variables produced by different subjects. We will address these issues when we have a proper record from below, noting only that, given the present "state of the art," virtually all of the courts which have considered the question have declined to admit the results of polygraph examinations. See, e.g., *United States* v. *Marshall*, 526 F.2d 1349,

---

[4] The State agreed that the admission of polygraph evidence is within the discretion of the trial court. We express no opinion as to the validity of this agreement. Nevertheless, even were we to review the decision of the trial court, the defendant would have the heavy burden of demonstrating an abuse of discretion.

1360 (9th Cir. 1975), *cert. denied*, 426 U.S. 923 (1976); *Akonom v. State*, 40 Md. App. 676, 678, 394 A.2d 1213, 1215-16 (1978); *People v. Barbara*, 400 Mich. 352, 411, 255 N.W.2d 171, 197 (1977); *State v. LaForest*, 106 N.H. 159, 161, 207 A.2d 429, 431 (1965).

## IV.

Defendant next argues that the court erred in not requiring special pleading by the State to reflect its alternate theories of culpability. Count one of the State's information charged the defendant as a principal in the first degree murder of the twelve-year-old girl. 13 V.S.A. § 2301. During its case-in-chief, the State also developed a theory that the defendant was an "accomplice," and could be held liable as a principal on that basis.

Defendant argues that the term "accomplice" embraces two distinct kinds of liability in Vermont: (1) as an accessory who *aids* in the commission of a crime, 13 V.S.A. § 3; *State v. Jaramillo*, 140 Vt. 206, 208, 436 A.2d 757, 759 (1981) (aiding in commission will support conviction as a principal), and (2) as an accessory before the fact. 13 V.S.A. § 4; *State v. Sears*, 130 Vt. 379, 381-82, 296 A.2d 218, 219 (1972) (preconceived plan to commit crime plus participation is sufficient).

Defendant relies on language in *Sears* and claims there was no evidence that defendant either aided his companion in murdering the younger girl, or had a preconceived plan to do so. Further, he cites *State v. Mecier*, 126 Vt. 260, 263, 227 A.2d 298, 300 (1967), for the proposition that one charged as a principal cannot be convicted on the basis of aiding. However, the Court in *Mecier* reversed a defendant's conviction as a principal because the evidence did not establish that he had either aided in the crime or been present at the scene. *Id.* at 262-63, 227 A.2d at 300.

■ In the instant case, the defendant was charged and found guilty of first degree murder as a principal and, unlike *Mecier*, there was sufficient evidence to support the conviction. Therefore, any error in failing to plead or prove an accomplice theory was harmless. V.R.Cr.P. 52(a).

## V.

Finally, defendant claims that he was deprived of due process because of the presence of the lay assistant judges at sentencing. Defendant maintains that sentencing entails questions of law

which preclude participation by lay judges under *State* v. *Dunkerley*, 134 Vt. 523, 526, 365 A.2d 131, 132 (1976).

Specifically, defendant urges us to expand our holding in *Dunkerley, supra,* and V.R.Cr.P. 54(c)(1)(ii) to support his claim that the participation of assistant judges at sentencing violated his Fourteenth Amendment right to due process. *Dunkerley* held that, because a defendant has a right to be represented at trial by legally trained counsel, allowing laymen, sitting as judges, to rule on issues of law would defeat the purpose of that constitutional requirement. *Id.* The scope of *Dunkerley* is intimated in 1976 Reporter's Notes to V.R.Cr.P. 54: "To satisfy due process requirements . . . [assistant judges'] power to overrule a Presiding Judge on *purely legal matters* has been judicially proscribed, but remains unaffected in all other respects, including the sentencing process."

Both *Dunkerley* and Rule 54(c)(1)(ii) are merely the means by which this Court has sought to define the power of assistant judges to conform to federal due process in the absence of guidance by federal authorities. However, in the area of sentencing, guidance exists which obviates the need to apply the prophylactic proscriptions of *Dunkerley* and Rule 54(c)(1)(ii). The United States Supreme Court has held that jury participation at sentencing does not violate due process.[5] *Chaffin* v. *Stynchcombe*, 412 U.S. 17, 22 (1973). Indeed, as recently as last year the Court recognized that:

> The sentencing court *or jury* must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant, given the crime committed.

*Wasman* v. *United States*, 468 U.S. 559, 563, 104 S. Ct. 3217, 3220 (1984) (emphasis added); see *State* v. *Cyr*, 141 Vt. 355, 358, 449 A.2d 926, 927 (1982).

---

[5] At least six states allow jury sentencing in all felony trials: Ark. Stat. Ann. § 41-802 (1977); Mo. Rev. Stat. § 557.036 (1985 Supp.); Okla. Stat. Ann. tit. 57, § 353 (West 1969); Tenn. Code Ann. § 40-20-107 (1982); Tex. Stat. Ann. art. 37.07 (Vernon 1981); Va. Code § 19.2-295 (1950). At least two states allow jury sentencing in capital cases only: Ga. Code Ann. § 17-10-31 (1982); N.C. Gen. Stat. § 15A-2000(b) (1983). Three other states allow jury sentencing for capital cases in an advisory capacity only: Ala. Code § 13A-5-46 (1982); Fla. Stat. Ann. § 921.141(2) (West Supp. 1985); Ky. Rev. Stat. Ann. § 532.025 (Michie 1985).

■ Thus, it would be incongruous to allow jury sentencing under the federal law, yet prohibit sentencing by lay judges. This is particularly so in view of the fact that assistant judges, by virtue of their daily association with the presiding law-trained judge in case after case, are certainly as well, if not better, prepared legally to determine a proper sentence than are juries who may have only one opportunity to perform that task. Accordingly, we hold that there is no constitutional bar to the participation of assistant judges at sentencing.

*Affirmed.*