# State of Vermont v. Samuel F. Wright

[581 A.2d 720]

No. 88-247

Present: Peck, Dooley and Morse, JJ., and Barney, C.J. (Ret.) and Keyser, J. (Ret.), Specially Assigned

Opinion Filed November 17, 1989

Motion for Reargument Denied June 29, 1990

514

*Karen Shingler,* Chittenden County Deputy State's Attorney, Burlington, and *Robert Katims,* Department of State's Attorneys, Montpelier, for Plaintiff-Appellee.

*Walter M. Morris, Jr.,* Defender General, and *Henry Hinton,* Appellate Defender, Montpelier, for Defendant-Appellant.

**Morse, J.** Defendant, Samuel Wright, was convicted by a jury of first degree murder, 13 V.S.A. § 2301, for killing Kimberly Giroux during the commission of a robbery.[1] On appeal, he argues for a new trial based on asserted errors in the court's instructions to the jury and certain evidentiary rulings. We affirm.

---

[1] 13 V.S.A. § 2301 provides in part: "Murder ... committed in perpetrating ... robbery [i.e., felony murder] ... shall be murder in the first degree."

Kimberly Giroux worked at the Champlain Farms convenience store in downtown Burlington. At about 6:00 p.m. on November 29, 1986, she was found dead in the store office. She had multiple stab wounds and her skull was crushed by a blow from a fire extinguisher found next to her body. Over $2000 was missing from the store. Footprints, matching defendant's sneakers, were visible in fire extinguisher residue that had been discharged in the room. Defendant's fingerprints were found on the fire extinguisher.

Defendant was a frequent customer in the store and an acquaintance of the victim. He was seen in the store at about 5:30 on the evening of November 29th. He testified that he returned about a half hour later, looked around the store for Ms. Giroux, and found her body in the back office. He moved the fire extinguisher to look at her since it was blocking her face. He was afraid to tell the police because he had been in some trouble with the police and thought he would be blamed for the murder.

Several witnesses testified that later during the evening of the 29th, defendant visited a nearby apartment with a large amount of money in small denominations stashed in several pockets, paid off a debt for cocaine that had been "fronted" to him some days before, and was uncharacteristically generous with his money, giving ten dollars to two children in the apartment and passing out dollar bills, according to one witness, "like he was dealing cards." His friends helped him count the money; one testified it amounted to $1500. That evening he also purchased more cocaine. On November 30, he bought an amethyst ring for his wife, Barbara, and she bought a new television set.

According to Barbara Wright, a knife was missing from a set in their kitchen. One of the State's experts testified that the stab wounds in the victim were inflicted by a knife with a blade similar to the one missing from the Wrights' set. At trial, defendant objected to this and other testimony given by his wife, asserting the marital privilege under V.R.E. 504.

Defendant consistently maintained his innocence of the homicide and robbery. His defense strategy at trial was to establish both his own innocence and the guilt of the victim's former boy

friend, Dominic Ladue. Defense counsel elicited testimony from several witnesses to demonstrate that Mr. Ladue had both the motive and opportunity to kill Kim Giroux. The defense suggested that he killed her in part because of his anger at her decision to have an abortion. To support this claim, the defense sought access to the victim's medical records. After reviewing the confidential records in camera, the trial court determined that they would not be helpful to the defense and refused to disclose their contents.

## I. *Jury Instructions on Lesser Included Offenses*

In addition to instructing the jury on the elements of felony murder, as charged in the State's information, the trial court instructed the jury on the lesser included degrees of homicide, namely, second degree murder, voluntary manslaughter and involuntary manslaughter. Defendant assigns three errors to these instructions. First, over defense counsel's objection, the trial judge did not tell the jury that, between a greater and a lesser offense (e.g., first degree murder and second degree murder), the jury must presume defendant guilty of the lesser. Second, also over counsel's objection, the judge instructed that the jury must find defendant not guilty of the greater charge before it could consider a lesser included charge:

> The Defendant is charged with felony murder of Kimberly Giroux, and I will explain what the State must prove for the Defendant to be found guilty of this offense. If the State cannot prove this offense, you will then have to decide whether the State has proven what is known as a lesser included offense, and I will also explain what that term means.
>
> . . . .
>
> If after consideration of all of the evidence you are satisfied that the State has proven each element of felony murder beyond a reasonable doubt, then you must find the Defendant guilty. If you find that the State has failed to prove any one of these elements beyond a reasonable doubt, then you must find the Defendant not guilty of felony murder.

If you find the Defendant not guilty of felony murder, you must go on to consider the lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter.

. . . .

If the State proves each of these elements [of second degree murder] beyond a reasonable doubt, then you must find the Defendant guilty of second degree murder. If however after consideration of all of the evidence you find the Defendant not guilty of second degree murder, you must then go on to consider the lesser included offense of manslaughter. Manslaughter is divided into two types, voluntary and involuntary manslaughter.

. . . .

If the State proves all of these elements [of voluntary manslaughter] beyond a reasonable doubt, then you must find the Defendant guilty of voluntary manslaughter. If however after consideration of all of the evidence you have a reasonable doubt about any one of these elements, then you must find the Defendant not guilty of voluntary manslaughter. You should then determine if the Defendant is guilty of involuntary manslaughter.

Third, defendant claims that the instructions on voluntary manslaughter amounted to plain error, because they included "sudden passion or great provocation" as an essential element of that offense.

■■ On all three points, defendant is correct that the jury instructions were erroneous. *State v. Duff*, 150 Vt. 329, 554 A.2d 214 (1988). In the circumstances of this case, however, we hold that these errors are harmless and do not warrant a new trial.

In *Duff*, the defendant "admitted committing the homicide . . . but claimed that he was guilty of only voluntary manslaughter . . . ." *Id.* at 331, 554 A.2d at 215. The defendant accordingly introduced evidence to show that he suffered from "diminished capacity" in order to negate the malice element of murder. *Id.* at 333, 554 A.2d at 216. In that context, the court's errors in the charge on lesser included offenses were prejudicial and war-

ranted a new trial. "The erroneous charge on the offense[] of voluntary manslaughter . . . clearly affected the 'substantial rights' of this defendant whose entire theory of the case revolved around his argument that [this was] the very crime[] that he had in fact committed." *Id.* at 338, 554 A.2d at 219 (citation omitted). The effect of the court's other errors on the defendant's substantial rights in *Duff* was somewhat less certain:

> While the trial court's erroneous charge as to the presumption of innocence as it applies to the degree of guilt or its erroneous transitional charge would not alone constitute plain error, we cannot ignore the totality of the improprieties when examining the fairness of defendant's trial.

*Id.* (citation omitted).

The posture of the instant case is entirely different. Unlike the defendant in *Duff*, this defendant consistently maintained his innocence of the homicide and robbery. Defendant contends that the "'[f]act that a defendant denies having any involvement in a crime . . . does not necessarily preclude him from obtaining an instruction on a lesser included offense if there are facts in evidence that would reasonably support such an instruction.'" Brief for Appellant, at 22 (quoting *State v. Green*, 207 Conn. 1, 14, 540 A.2d 659, 666 (1988)). Without deciding whether this proposition correctly states the law in Vermont, we find that the facts in evidence in this case do *not* support the instruction on lesser included offenses. Second degree murder would have been the appropriate charge, for example, if no robbery had accompanied the homicide. But the evidence overwhelmingly established that the killing had occurred during the commission of a robbery. Manslaughter would have been the appropriate charge in the absence of malice—either by reason of sudden passion or great provocation or by reason of diminished capacity. See *Duff*, 150 Vt. at 331, 554 A.2d at 215. Here, however, there was no evidence whatsoever to suggest that defendant committed a homicide in sudden passion or under great provocation.[2] Nor was there evidence that defendant acted under di-

---

[2] The defense did try to show that Dominic Ladue had killed Ms. Giroux in the

minished capacity.[3] It is true that evidence was introduced to show defendant's abuse of alcohol, marijuana and cocaine, both during the month leading up to the homicide, and during the evening *after* the homicide.[4] No evidence, however, suggested that defendant was under the influence of drugs or alcohol at the time of the homicide. In short, the record supports a verdict that defendant was either guilty of felony murder or not guilty of any homicide, but does not support a verdict of a lesser degree of homicide.

■■ Vermont Rule of Criminal Procedure 52(a) requires that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." We have restated the harmless error rule as follows:

Harmless error analysis requires the reviewing court to inquire if, absent the alleged error, it is clear beyond a rea-

---

heat of sudden passion or great provocation. This is not relevant to defendant's claim here.

[3] While defense counsel did object to the jury instructions in several respects, it is noteworthy that counsel did not specifically request an instruction on diminished capacity, nor object to its omission.

[4] Much of this evidence was elicited, ironically, by the State over defense objection. At trial, the State introduced evidence of defendant's drug habit and of his paying off a drug-related debt and purchase of more drugs in the hours immediately after the homicide, in order to establish a motive for the robbery, as well as to furnish evidence of the robbery itself. (For example, according to witnesses, defendant paid his debt with cash in small denominations that he had not yet counted.) Defense counsel objected, in particular, to testimony that defendant's condition was deteriorating in the month prior to the homicide. (See testimony of Ronald Sweeten.) Counsel also elicited testimony that on the evening of the crime defendant was acting normally and did not appear to be under the influence of alcohol or drugs. (See cross-examinations of Steven Deyette and Steven Vuley.) In his closing argument to the jury, defense counsel argued as follows:

[T]he overwhelming majority of the testimony you have heard from the people who knew and had contact with Sam Wright shortly before and shortly after the offense establishes that he was acting no different than he always acted. They describe Sam as the basically fairly hyper person, but that they noticed no discernible change in him either shortly before or shortly after the event. That's the overwhelming majority of the evidence that you have heard.

Defendant is now in the awkward position of downplaying the evidence elicited by his own counsel and relying on evidence his counsel tried to keep from the jury.

sonable doubt that the jury would have returned a guilty verdict regardless of the error. Thus, analysis under the harmless error doctrine focuses on the evidence of guilt present in the record.

*State v. Hamlin*, 146 Vt. 97, 106, 499 A.2d 45, 52 (1985) (citations omitted).[5] We conclude that the errors in the jury instructions pertaining to lesser included offenses were harmless. It is clear beyond a reasonable doubt, in a case where the evidence in support of the offense charged was great and the evidence in support of lesser included offenses was virtually nil, that the verdict was unaffected by the errors.

The one omission from the trial court's instructions to the jury that *might* have affected the jury's deliberations, in our view, was the failure to instruct on diminished capacity. Defendant, however, did not request such an instruction, did not object to its omission, did not argue diminished capacity to the jury,[6] and does not squarely raise the question on appeal. Even if the question were properly raised on appeal, defendant's failure to object as required by V.R.Cr.P. 30[7] must be treated as a failure to preserve the issue for appeal—unless the omission is so egregious as to amount to "plain error." V.R.Cr.P. 52(b); see *State v. Roy*, 151 Vt. 17, 22, 557 A.2d 884, 887–88 (1989).

██ Any error here was far from obvious—indeed, absent a request for an instruction on diminished capacity, we are unwilling to conclude that an error was committed at all—and probably had no substantial influence on the jury's deliberations. Unlike *Duff*, where we found plain error, here the trial

---

[5] *Hamlin* applied the federal harmless error rule. 146 Vt. at 105, 499 A.2d at 51. Our inquiry in cases involving matters of purely state law, however, is identical. See *State v. Catsam*, 148 Vt. 366, 371–72, 534 A.2d 184, 188 (1987) (citing *Hamlin*).

[6] It is not surprising that the defense proceeded this way; to do otherwise may well have weakened the claim of innocence.

[7] Rule 30 provides: "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

did not revolve around a defense theory of diminished capacity. See *Duff*, 150 Vt. at 338, 554 A.2d at 219.

## II. *Robbery Instructions*

Defendant claims that the trial court committed plain error by omitting the assault element from its instructions on the elements of robbery. It is true, as defendant argues, that the crime of "assault and robbery," as defined in 13 V.S.A. § 608, involves the element of assault, and in any trial under that statute the jury must be adequately instructed on all the elements. See *State v. Francis*, 151 Vt. 296, 307, 561 A.2d 392, 398 (1989). This trial, however, was for felony murder, 13 V.S.A. § 2301. The judge explained to the jury that defendant was charged with killing Ms. Giroux "during the commission of a robbery." The elements of murder—the assault in this case—were fully explained. It would have been confusing and probably misleading in this context to further discuss assault as an element of robbery. There is no error.[8]

## III. *Victim's Medical Records*

The defense presented a theory that the victim's former boy friend killed her in a fit of anger. As defense counsel summed up to the jury:

> He goes to the store [before 6:00 p.m. on November 29th] to resolve the issues that he has been seething about that have been boiling up inside of him. She tells him that she's breaking off with him, she's going to get back together with Charles Stout, she's going to make a life with him, she doesn't want to have anything more to do with Dominic. And the final straw is she tells Dominic Ladue, "I'm not pregnant with your child anymore, I aborted it." And Dominic Ladue couldn't handle that.
>
> And in a drunken violent rage, he killed Kimberly Giroux
> . . . .

---

[8] Defendant similarly claims that the information is defective in that it fails to allege the assault element of robbery. Again, the assault in this case was murder, which was alleged in the information. The information reasonably indicated the exact offense charged. See *State v. Francis*, 151 Vt. at 308, 561 A.2d at 399.

To support the evidence of Ms. Giroux's recent abortion, defendant subpoenaed Ms. Giroux's medical records. The custodian of the records, University Associates in Obstetrics and Gynecology, Inc., and University Health Center, Inc., opposed disclosure. The trial court initially ordered disclosure to the defense, and an interlocutory appeal was taken to this Court. We ordered the records custodian to provide the materials requested in the subpoena to the trial judge for the purpose of an in camera examination to determine whether the records were privileged under 12 V.S.A. § 1612(c).[9] After reviewing the records in camera, the trial court ruled against disclosure.

Defendant contends that 12 V.S.A. § 1612 does not bar disclosure of the records in this case, on the ground that V.R.E. 503(d)(3)[10] constitutes "an express provision of law" sufficient to waive the medical privilege under § 1612(a). Whatever the merits of this argument, it is evident from the transcript that the court's decision barring disclosure was based, not just on § 1612, but also on the conclusion that the materials would not be "helpful" to the defendant. While the medical records apparently contain "relevant materials" in that they pertain to the victim's pregnancy and/or abortion, Judge Levitt concluded as follows:

---

[9] 12 V.S.A. § 1612 provides in part:

(a) Confidential information privileged. Unless the patient waives the privilege or unless the privilege is waived by an express provision of law, a person authorized to practice medicine . . . shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity.

. . . .

(c) Mental or physical condition of deceased patient. A physician or nurse shall be required to disclose any information as to the mental or physical condition of a deceased patient privileged under subsection (a), except information which would tend to disgrace the memory of the decedent, either in the absence of an objection by a party to the litigation or when the privilege has been waived . . . .

[10] V.R.E. 503(d)(3) provides in pertinent part:

There is no privilege under this rule as to a communication relevant to an issue of the physical, mental, or emotional condition of the patient . . . after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense . . . .

In any event, the rule, promulgated in 1983, generally supersedes the 1974 statute.

[Section 1612(c)] does not allow[] what I thought to be was the relevant materials from her medical records to be introduced. On the other hand though, much of what you [defense] want to introduce has already been introduced through other witnesses which testimony would allow today.

. . . .

I think that I have allowed much of the material to come out as you [defense] wanted it, because I thought maybe there would be some problem under [§ 1612]. And so much of it has already come out to begin with. So I don't think you have suffered any prejudice. . . . Also in reviewing the materials contained within the file I don't think they will be helpful to your particular defense that you presented.

Thus it is fair to read the court's decision as an exercise of discretion under V.R.E. 403: Relevant evidence "may be excluded if its probative value is substantially outweighed . . . by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here, the probative value of the medical records was marginal. At best, they would show that the victim had procured an abortion, but that fact, of course, would not by itself establish that her former boy friend knew of the event. Therefore, the records were only tenuously related to a fact in issue at trial, namely, Mr. Ladue's state of mind.[11] Furthermore, what the records could show had already been shown. Mr. Ladue admitted that he knew Ms. Giroux was pregnant. A friend of the victim's who had accompanied her to the University Medical Center for an appointment testified that Ms. Giroux had had an abortion. And the medical examiner who

---

[11] Of course, if the records showed that Mr. Ladue was present at the abortion or otherwise knew of its occurrence, they would then be more probative. But this possibility contradicted the defense theory that Mr. Ladue learned of the abortion only on the evening of November 29th. In closing argument to the jury, defense counsel emphasized:

Kimberly Giroux tells Dominic Ladue she's pregnant with his child. [W]e know now, ladies and gentlemen, from Dr. Morrow's testimony, from Kim Toner's testimony and from the datebook . . . that when Kimberly Giroux told Dominic Ladue . . . the night before her death she was pregnant with his child, that that simply wasn't the case.

performed the autopsy testified that she was not pregnant within the thirty days prior to her death. The records could reveal nothing more of substance.

In addition to the statutory argument, defendant claims a constitutional right to present the medical records to the jury in aid of his defense. There is, however, no constitutional right to introduce irrelevant evidence or marginally relevant but cumulative evidence. See *State v. Roy*, 151 Vt. at 35, 557 A.2d at 895 (no constitutional right of access to police officer's personnel file where information therein would not be admissible as evidence); *State v. Patnaude*, 140 Vt. 361, 370, 438 A.2d 402, 409 (1981).

*Davis v. Alaska*, 415 U.S. 308 (1974), upon which defendant principally relies, is inapposite. In that case, the United States Supreme Court held that a defendant's rights under the federal Confrontation Clause were denied when he was prohibited from questioning a key prosecution witness concerning the witness's juvenile criminal record. The Court stated:

> The accuracy and truthfulness of [the witness's] testimony were key elements in the State's case against petitioner. The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the witness's] vulnerable status as a probationer
> . . . .

*Id.* at 317–18. The considerations present in the instant case are entirely dissimilar. As we have stated, the trial court determined, after reviewing the materials in camera, that they were not admissible because they were not helpful to the defense and were cumulative. See *Pennsylvania v. Ritchie*, 480 U.S. 39, 61 (1987) (trial court on remand should conduct in camera inspection of privileged material to determine whether its disclosure probably would have changed outcome of trial).

Furthermore, in *Davis*, the defense sought to impeach a witness testifying for the State:

> The State could have protected [the witness] from exposure of his juvenile adjudication in these circumstances by refraining from using him to make out its case; the State cannot, consistent with the right of confrontation, require the

petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records.

415 U.S. at 320. In contrast, in the case at bar, the State had not put on the evidence that information from Ms. Giroux's medical file was expected to rebut or impeach. At most, the medical records would be used to substantiate the testimony of the medical examiner and the victim's friend (a defense witness).

In light of the policy favoring confidentiality of medical records—and the especially private nature of gynecological records—the trial court's decision not to publish Ms. Giroux's medical file in these circumstances must be affirmed.

## IV. Marital Privilege

Over defendant's objections, expressed both in pretrial motions and during trial, the trial court permitted the State to question defendant's wife, Barbara Wright. Her testimony, unquestionably damaging to the defense, included the following: Defendant was not home at the time the crime was committed; when he arrived home, about two hours later, he had certain symptoms ("tightness in the face") of cocaine use; at that time he changed his clothes; when police officers arrived later that evening, she told them that a boning knife was missing from their kitchen;[12] the family did not have a lot of money around the date of the crime; Barbara Wright purchased a color television set with cash on the day after the crime.

Defendant maintains that all this testimony was admitted in violation of the husband-wife privilege, V.R.E. 504, which provides in part as follows:

(a) Definition. A statement, letter, conversation, or other communication is "confidential" if it is made privately by any person and is not intended for disclosure to any other person.

(b) General rule of privilege. Any person has a privilege to refuse to disclose and to prevent his spouse or any other person from disclosing any confidential statement, conversa-

---

[12] An expert witness for the State testified that a knife similar to the one missing from the Wrights' kitchen was used to stab the victim.

tion, letter, or other confidential communication between such person and his spouse occurring while they were lawfully married, and to refuse to testify and prevent his spouse from testifying in any case as to any matter which in the opinion of the court would lead to a violation of marital confidence. . . .

The rule extends the marital privilege to two types of testimony: first, concerning confidential communications made during marriage; second, concerning matters that would breach a marital confidence.[13] Defendant argues specifically that the testimony that he changed his clothes on the evening of the crime disclosed a confidential communication and that the remaining testimony was admitted in violation of marital confidence.[14]

### A. *Confidential Communications*

■ Words in a statute are to be given their plain meaning. *Vermont State Employees' Ass'n v. State*, 151 Vt. 492, 494, 562 A.2d 1054, 1056 (1989). V.R.E. 504(b) permits a witness to refuse to disclose "any confidential statement, conversation, letter, or other confidential communication between such person and [her] spouse." Nonsymbolic conduct such as changing one's clothes is not commonly considered a form of communication, and the language used in the rule does not suggest otherwise; indeed, the types of communication specified are all examples of verbal communication. It strains credulity to suggest that the drafters of the rule intended to pack into the words "other confidential communication" a noncommunicative sort of conduct that is wholly

---

[13] Prior to the adoption of the Vermont Rules of Evidence in 1983, the privilege, codified at 12 V.S.A. § 1605, was broader, prohibiting either spouse from testifying against the other, in both civil and criminal trials, as to *any* "communication made to the other or to another person" or as to any "matter which, in the opinion of the court, would lead to a violation of marital confidence." See *State v. Muzzy*, 87 Vt. 267, 269–70, 88 A. 895, 896 (1913). Even prior to the enactment of the statute in 1904, however, the Court required that privileged communications be confidential. Reporter's Notes, V.R.E. 504, at 366 (citing *State v. Center*, 35 Vt. 378, 386 (1862)).

[14] In a pretrial ruling, the trial court did bar certain statements made by defendant to his wife, as well as a communicative act (handing her money while instructing her to buy a television), as confidential communications under Rule 504.

unrelated to the forms of communication expressly included in the privilege. See E. Cleary, McCormick on Evidence § 79 (3d ed. 1984) (privilege for communications "should be limited to *expressions* intended by one spouse to convey a meaning or message to the other") (emphasis in original).

Furthermore, in construing language in a statute, we must look to the whole statute. *In re R.S. Audley, Inc.*, 151 Vt. 513, 517, 562 A.2d 1046, 1049 (1989). Defendant would construe the "confidential communications" prong of Rule 504 so broadly as to render superfluous the "marital confidence" prong. This is clearly not what the rule intends. See Reporter's Notes, V.R.E. 504, at 366 (The confidential communications privilege "should be narrowly construed to include only matters that are plainly and literally communications, because the rule also carries forward the statutory provision giving the court discretion to protect 'marital confidence.' Any claim of privilege for a matter that is not literally a communication should be dealt with under the latter provision.").

■■■ We find that no privilege in confidential communications was violated. We now turn to the second part of Rule 504(b), under which a witness may "refuse to testify . . . as to any matter which in the opinion of the court would lead to a violation of marital confidence."

## B. *Marital Confidences*

Defendant's efforts to bar testimony of a broad array of his wife's observations and conduct would effectively turn Vermont's relatively confined privilege of marital confidences and confidential communications into a rule rendering all spousal testimony incompetent. In our view, this interpretation of Rule 504 is altogether too broad and misunderstands the design of the Vermont provision.

The early common law disqualified the spouse of a party from testifying either for or against the party in any case. McCormick at § 66. A remnant of this broad competency rule persists in many states: "[I]t is sometimes provided that the prosecution may not call the spouse, without the consent of the accused

spouse, thus preserving for criminal cases the privilege of the accused to keep the spouse off the stand altogether." *Id.*; see *Trammel v. United States*, 445 U.S. 40, 48 n.9 (1980). This rule has been sharply criticized, however. "Professor Wigmore termed it 'the merest anachronism in legal theory and an indefensible obstruction to truth in practice.'" *Trammel*, 445 U.S. at 45 (quoting 8 J. Wigmore, Evidence § 2228, at 221 (McNaughton rev. 1961)). The Uniform Rules of Evidence, reflecting the United States Supreme Court's decision in *Trammel*, place the privilege to refuse to testify against an accused in the hands of the spouse of the accused. Unif. R. Evid. 504(b), 13A U.L.A. 302 (1986).

While the Vermont rule applies equally to civil and criminal cases, Vermont is not one of the states that retains a broad privilege against adverse testimony. As stated in the Reporter's Notes to Rule 504: "The present rule bars only particular testimony as to communications and confidences." Reporter's Notes, V.R.E. 504, at 366. The privilege for matters that would reveal a marital confidence fits hand in glove with the privilege for confidential communications. The latter protects what is expressed in confidence between the spouses; the former protects what is learned in confidence. "[I]t literally include[s] not only communications but any knowledge that the testifying spouse had obtained as a result of marital confidence . . . ." Reporter's Notes, V.R.E. 504, at 365. Thus would the privilege be expected, with perhaps unwarranted optimism, to protect and promote the marital relationship by encouraging and preserving confidences between the wife and husband.

 Furthermore, the provision on marital confidences is written expressly to give the trial judge discretion. As with any discretionary ruling, a party claiming abuse of discretion "must show that the court failed to exercise its discretion, or that its discretion was exercised for reasons clearly untenable or to an extent clearly unreasonable." *In re T. S.*, 144 Vt. 592, 594, 481 A.2d 21, 22 (1984). On appeal, the burden of showing an abuse of

discretion is on the party seeking to overturn the trial court's judgment. *Id.*[15]

In our view, the trial judge properly exercised her discretion in allowing all of the disputed testimony. None of the items would clearly lead to a violation of marital confidence.

Perhaps Ms. Wright's most damaging testimony concerned the missing boning knife. There was no indication, however, that her knowledge of the missing knife was obtained in confidence. Most likely, she simply observed, in her daily use of the kitchen, that one of the knives was missing. We might usefully contrast her testimony with the hypothetical testimony that she watched her husband remove a knife from the kitchen set and leave the apartment. That evidence could properly be excluded as leading to a violation of marital confidence. Cf. *French v. Ware*, 65 Vt. at 347–48, 26 A. at 1099 (wife may not testify "to any facts or transactions which directly show the husband has been guilty of a crime, such as that she saw him in the act of committing the crime. The law assumes that no husband will commit a crime in the presence of his wife, except in the confidence induced by the marital relation.").

The testimony that defendant changed his clothes when he returned home presents a somewhat closer question. Changing one's clothes is frequently a private act. However, absent other evidence—that, for example, his clothes were covered with blood and he gave them to her to launder, or that changing his clothes in the evening was so unusual as to signify emotional turmoil—there was no reason to suppose that the testimony would

---

[15] Early decisions by this Court emphasized the broad discretion in the trial court to determine whether the admission of testimony would violate a marital confidence. When a trial court admitted a spouse's testimony over an objection that it would lead to a violation of marital confidence, under the predecessor statute to Rule 504 (12 V.S.A. § 1605), this Court stated that the exercise of the court's judgment "in determining what the testimony may lead to cannot be reviewable in ordinary circumstances." *State v. Nieburg*, 86 Vt. 392, 394, 85 A. 769, 769 (1913); see also *French v. Ware*, 65 Vt. 338, 345, 26 A. 1096, 1099 (1892) ("Doubtless some latitude must be given to the trial court, in determining whether the offered testimony, under the existing circumstances of the case, involves the disclosure of matters of confidence.").

lead to a violation of marital confidence, and allowing it was not an abuse of discretion. As is evident from these examples, the privilege may be irrational from the point of view of one seeking the truth; the most incriminating testimony appears to be privileged. This insight demonstrates only that Rule 504 is not about promoting the truth: it is designed to protect matters of confidence between spouses *regardless* of their value to determining the correct outcome at trial.

■ Ms. Wright also testified that she observed symptoms of cocaine use evident in defendant's facial features. But defendant's use of cocaine was notorious, and many of his acquaintances might have observed the symptoms. She further testified that he arrived home only two hours after the crime was committed. There was nothing private or confidential in that fact. She testified that she purchased a color television with cash. This was a public act in a public place and involved no breach of confidence.

We turn finally to the testimony regarding the family finances. Here, Ms. Wright's testimony would be expected to reveal to the jury and the public matters that for some are private and on occasion embarrassing; in short, matters that a married couple often expects to keep to itself. On the other hand, Ms. Wright's knowledge of their finances may have been obtained quite independently of her husband; to that extent, the marital privilege did not apply. The trial court concluded that in the circumstances of this case the disputed testimony would not betray a confidence. No abuse of discretion has been shown.

■ In any event, the testimony on the couple's finances was the least damaging portion of Barbara Wright's testimony. Even had the Wrights been mired in debt, the fact would have produced little insight in a trial where several other witnesses testified that defendant was often in their debt and typically short of cash. But Ms. Wright's testimony was not even that conclusive. This is the full extent of her testimony regarding finances:

 Q. Mrs. Wright, what were your family finances around November 29th of 1986?

 A. They were fine.

Q. When you say "fine," what do you mean?

A. We weren't destitute.

Q. Did you have a lot of money?

A. No.

Q. Were you able to pay all your bills?

A. We tried to.

Q. But you were not able to pay them all?

A. Well, we could pay the rent and everything.

Considerable evidence was produced at trial to support a motive for robbery; this particular testimony added little, if any, weight. We can say with confidence beyond a reasonable doubt that the outcome of the trial would have been the same had Ms. Wright's testimony on the family finances been excluded. See *State v. Hamlin*, 146 Vt. at 106, 499 A.2d at 52. Therefore, even if the admission of the evidence violated Rule 504's marital privilege, the error was harmless.

*Affirmed.*