**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | I.D. No. 2403006496 |
| v. | ) | |
| | ) | |
| BRADLEY GREEN, | ) | |
| | ) | |
| Defendant. | | |

Submitted: January 23, 2026
Decided: February 13, 2026

In this criminal case with allegations of child sexual abuse, the State of Delaware has moved to exclude testimony of Mr. Green's proposed expert forensic psychologist at trial. In their moving papers, the parties addressed whether Dr. Byrnes would offer impermissible commentary on the credibility of the witnesses.[1] During the hearing, additional questions arose which implicate this Court's gatekeeping function as to relevance and reliability.

The Court was provided with a 21-page report from the proffered expert. During the hearing, the defense submitted a revised expert disclosure, indicating it

---

[1] *See State v. Floray,* 715 A.2d 855, 862–63 (Del. 1997) (discussing general prohibition on expert testimony that pertains to witness credibility). In part, the focus on impermissible opinion related to the credibility of witnesses stemmed from portions of Dr. Byrnes' report; for example, "[i]t would be difficult to definitely affirm Mr. Green engaged her in this behavior." Report of Dr. Byrnes, State's Mot. *in Limine*, Ex. A, at 18. "The investigation process in the current case has deviated markedly and in several ways from best practices, giving rise to significant concerns as to how statements provided by Harmoni and Hannah can be interpreted." Report of Dr. Byrnes, State's Mot. *in Limine*, Ex. A. at 21.

comprised the sum and substance of the testimony expected from Dr. Byrnes. That revised disclosure states Mr. Green proffers Dr. Byrnes to testify regarding:

> general empirical findings regarding factors that increase or decrease the reliability of children's reports of prior events. She will educate the [] jury about general scientific findings regarding the reliability of children's reports so that can use the information in weighing the evidence. Dr. Byrnes will discuss memory formation, as well as factors that may affect memory.
>
> Dr. Byrnes may review various factors that are known to influence a child's reporting of physical or sexual abuse. These factors may include the circumstances of the child and family, the specific characteristics of the child [], the nature of the allegations, and the circumstances surrounding statements made by the child. Dr. Byrnes will discuss the psychological research literature as it relates to the timing and reliability of child abuse reports made by children and the factors that contribute to that reliability, such as repeated interviewing and the reactions of persons to whom the child makes statements.
>
> Dr. Byrnes will discuss the importance of proper child forensic interviewing techniques, and the effect that the proper or improper use of such techniques is likely to have on the quality of a child interview. These topics may include the impact of leading questions, developmentally inappropriate language, and forced choice or yes/no questions, as well as confirmatory bias on the part of the interviewer.
>
> Dr. Byrnes will discuss the issues related to a child's participation in psychotherapy or counseling, the impact of exposure of a child to reports by other persons (particularly parents) or alleged abusive experiences, and the potential for the development of source misattribution errors (a specific type of memory error based on such experiences).
>
> Dr. Byrnes will apply these factors to the case in question, and may also discuss the extent to which the child interviews in this specific case adhered to best practice standards. Dr. Byrnes will discuss the research area of juror knowledge and awareness of the above factors as well. Dr.

Byrnes will not opine on the issue of credibility (believability) of the child, as that issue is solely the province of the trier of fact.

Dr. Byrnes provided testimony to this Court to assist in making its determination. She testified memory develops across our life span, including during middle age and within the geriatric population. She cited familiarity with studies regarding memory and malleability.

Dr. Byrnes has experience with the Finding Words/ChildFirst course, which was employed by the interviewers in this case; first as an observer, then as a participant, and most recently with a refresher course. She testified protocols have been established to limit suggestibility in interviews with children—specifically citing concerns with questions that are (1) repeated, (2) leading, (3) problematically phrased, (4) force choice responses, and (5) limit exposure to information.

Less clear, though, was Dr. Byrnes' testimony regarding methodology for assessing the integrity of a forensic interview. She testified regarding a Martindale rubric, the specifics of which were not provided to the Court. Although she was unsure if this rubric was utilized under the ChildFirst protocol, she testified that it was akin to the ChildFirst protocol. She was also unsure if the work of Dr. Martindale was peer-reviewed. When asked during cross-examination if her opinion as to whether a deviation or contamination is subjective, Dr. Byrnes explained

forensic interviewers are provided training and feedback on videotaped interviews. She stated specific scores are not part of the rubric.

Within the context of forensic interviewing, Dr. Byrnes explained that contamination is anything that can contribute to inaccuracies in the account. Contamination can come from within the interview or outside the interview, but the protocols are designed to limit contamination. However, according to Dr. Byrnes, there is no methodology available to determine if an interview has been contaminated.

Dr. Byrnes also spoke about a study which measured the amount of influence caregivers can have on children's memories, finding 20% of the participants were influenced. She testified source monitoring is weaker in children than adults and thus the forensic interviewer's intent is to maximize reliable information. However, she did not necessarily equate reliability with honesty. She noted "[t]here is no such thing as a perfect interview." Dr. Byrnes has testified previously;[2] however, she has never testified in a criminal case regarding forensic interviewing protocols.

### Dr. Byrnes' Opinions on this Case

As for Mr. Green's case, Dr. Byrnes opined the interviews lacked fidelity to the protocols and those deviations caused significant concern. In her work on this

---

[2] Her prior testimony was on divorce and custody. She also testified on specific clinical matters related to her work at the Audrey Hepburn Children's House.

case, Dr. Byrnes only reviewed four of the seven total interviews of the child-witnesses. She also reviewed one of two surveillance videos taken from inside the home. Dr. Byrnes was aware of the existence of additional interviews.[3] The fact that her materials were limited did not prevent her from providing an analysis including "[t]here are clear concerns that forensic interviews conducted with the [] girls did not adhere to best practices in forensic interviewing."[4] Dr. Byrnes is critical the interviewer "did not sufficiently explain ground rules pertaining to the interaction…"[5]

One criticism by Dr. Byrnes of the interviews of the child-witnesses in this case relates to multiple interviews of the children. Hannah was interviewed four times. Her first interview, in June of 2023, was prompted by statements Hannah made to her mother, suggesting the defendant "peed" on her hand; however, Hannah did not disclose any allegations of criminal wrongdoing by Mr. Green. A second interview was prompted in October by video surveillance, within the home, of purported physical abuse. Again, no sexual abuse was disclosed. A third interview was conducted in Maryland, as a precaution, after a third-party made allegations against the children's grandfather. A fourth interview took place in October of 2024, after Hannah told her mother she was "ready to talk." It appears she made

---

[3] See report of Dr. Byrnes at p. 14-5.
[4] See report of Dr. Byrnes at p. 14-5.
[5] Id. at p. 15.

disclosures during this fourth interview.  Dr. Byrnes only reviewed the latter two of these recorded interviews.

Harmoni was interviewed in June of 2023 because of the statement purportedly made by Hannah to her mother.  Harmoni was again interviewed in October of 2023.  Finally, Harmoni was interviewed in March of 2024, during which time she made a disclosure of alleged sexual abuse by Mr. Green.  Dr. Byrnes reviewed two of those three interviews.

As noted, a focus of her full report and the more streamlined summary of her testimony critical of the methods used in this case relates to multiple interviews. However, on cross examination, Dr. Byrnes acknowledged the ChildFirst manual permits multiple interviews, if required by the situation, so long as they are open-ended and non-leading.  She also recognized that a second or third interview is within protocol if the child would like to talk.  Relatedly, she is critical that the interviewer did not engage in building rapport with the child during subsequent interviews. However, on cross examination, she agreed a second interview does not require rapport building.  Moreover, she never reviewed the initial interviews.

### *Use of Photographs During the Interview*

Another criticism of Dr. Byrnes' is of the use of surveillance stills by the interviewer.  Specifically, she testified there is no reason to believe a common photo

of a household room would trigger the memory. But that testimony was not linked to a particular fact of suggestibility or study.

### *Written Responses*

Dr. Byrnes criticized the interviewer for permitting the child-witness to write answers to questions instead of verbalizing them. Specifically, Dr. Byrnes pointed out that the goal is to interview the child. She opined the interviewer engaged in this tactic because she was uncomfortable. However, when asked if this was her subjective belief, she did not answer directly. On cross-examination, Dr. Byrnes agreed the ChildFirst protocol advises interviewers should "observe non-verbal ways the child communicates."

### *Clarification*

Dr. Byrnes criticized the interviewer for not clarifying "confusing" details put forth by one child witness. She testified the ChildFirst protocol requires follow-up. For example, she found the child's description of a penis as a "pillow" to be confusing.

### *Contamination*

The report of Dr. Byrnes addresses concerns related to contamination. Specifically, she discusses the fact that the initial disclosure was made to an adult, and she suggests the possibility that person may have contaminated the child's memory by questioning. Her report states "[i]t would not be unreasonable to believe

a parent facing such shocking information and having had alcohol would likely engage in problematic interactions discussed above that have been shown to impact statements provided upon interview."

### *Legal Standards*

As the proponent of the testimony in this case, Mr. Green bears the burden by a preponderance of the evidence.[6]  Specifically, Mr. Green must demonstrate by a preponderance of the evidence that Dr. Byrnes' opinions are reliable.[7]  This Court "must act as a gatekeeper and determine that the evidence is both (1) reliable and (2) relevant."[8]  "Ultimately, the testimony of an expert is admitted upon the theory that, in a particular case, the issue is such that the jurors are not competent to draw their own conclusions from the facts without the aid of the expert."[9]  In making this determination, the Court looks to D.R.E. 702 and to *Daubert*.[10]

Delaware Rule of Evidence 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

---

[6] *In re Zantac (Ranitidine) Litigation*, 342 A.3d 1131, 1144 (Del. 2025) *citing Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 795 (Del. 2006).
[7] *State v. McMullen*, 900 A.2d 103, 114 (Del. Super. Ct. 2006) *citing In re Paoli R.R. Yard P.C.B. Litigation*, 35 F.3d 717 (3d Cir. 1994).
[8] *In re Zantac (Ranitidine) Litigation*, 342 A.3d at 1144 *quoting Tumlinson v. Advanced Micro Devices, Inc.*, 106 A.3d 983, 990 (Del. 2013).
[9] *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 846 (Del. Super. Ct. 2000) (citation omitted).
[10] D.R.E. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

This Court must be focused on principles and methodology, not the conclusions of the expert—and while the Court's inquiry is guided by factors, they are flexible.[11] The factors which have been identified[12] include:

(1) Whether the expert opinion testimony "can be (and has been) tested"

(2) Whether the opinion testimony "has been subjected to peer review and publication"

(3) The "known or potential rate of error" and

(4) Whether it has attracted widespread acceptance within the scientific community.

---

[11] *Daubert*, 509 U.S. at 594.
[12] Most recently in *In re Zantac (Ranitidine) Litigation*, 342 A.3d at 1144 *quoting Daubert*, 509 U.S. at 593–94.

The Delaware Supreme Court has recently reaffirmed the seriousness of this Court's obligation as a gatekeeper and that this Court should not presume admissibility:

> Rule 702 and *Daubert* establish the sufficiency and reliability elements and the threshold that a proponent of expert testimony must meet to establish admissibility. Unless that threshold is met, expert testimony is not admissible, and trial courts should not approach a challenge to expert testimony with any presumption toward admissibility.[13]

As to relevance, the proffered expert testimony must both "relate to an 'issue in the case' and 'assist the trier of fact to understand the evidence or to determine a fact issue.'"[14] "Courts are not just to let the opinion of the credentialed expert into evidence for what it is worth and leave its evaluation to the jury."[15] While the Court should consider the expert's background,

> [t]he words of an expert qualified to opine within a recognized "field" do not automatically guarantee reliable, and therefore admissible, testimony, however. The inquiry will be whether the expert and the "field of expertise" itself can produce an opinion that is sufficiently informed, testable and in fact verifiable on an issue to be determined at trial.[16]

In Delaware, our Supreme Court addressed the State offering expert testimony in the context of intrafamily child sexual abuse where "a complainant's behavior or testimony is, to the average layperson, superficially inconsistent with the occurrence

---

[13] *Id.* at 1147.

[14] *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264 (Del. 2013) (internal footnote omitted) *quoting Daubert*, 509 U.S. at 591.

[15] *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 841 (Del. 2000).

[16] *Eskin v. Carden*, 842 A.2d 1222, 1228 (Del. 2004).

of a rape, and its otherwise inadequately explained, thus requiring an expert's explanation of its emotional antecedents, expert testimony can assist a jury in this regard."[17] In *Wheat,* the Court held

> that limited use of expert testimony in child sexual abuse prosecutions is appropriate to assist the finder of fact, whether judge or jury, in evaluating the psychological dynamics and resulting behavior patterns of alleged victims of child abuse, where the child's behavior is not within the common experience of the average juror. To the extent such expert testimony is given in general terms and directed to behavior factors in evidence, it is admissible. To the extent it attempts to quantify the veracity of a particular witness or provide a statistical test for truth telling in the courtroom, it is clearly unacceptable.[18]

For support of his position in this case, Mr. Green has attached the transcript from a case tried in this Court.[19] In *Smith,* after *voir dire* of the expert, the Court limited the testimony it would allow. The Court found the expert competent to testify on memory and proper interviewing techniques. That decision carefully limited the testimony, noting that our Supreme Court has held it would be improper for an expert witness to opine as to the truth or falsity of testimony. The scope of his testimony included proper interviewing techniques, his opinion that the interviews conducted in the case displayed poor techniques, contamination, risk of therapy before

---

[17] *Wheat v. State*, 527 A.2d 269, 273 (Del. 1987).
[18] *Id*. at 275 (Del. 1987).
[19] *State v. Micah Smith*, C.A. No. 1512004476. *See* Def. Resp., Ex. B.

interviews, and the best methodology for eliciting information.[20]  The defense expert in *Smith* was not Dr. Byrnes.

The State points to this Court's decision in *State v. Herbert*.[21]  In *Herbert* the defense expert was prepared to opine that the child's memory was "vague" and "illogical."  This Court found her testimony to be inadmissible because it directly and indirectly attacked the credibility of the child-witness.  While portions of Dr. Byrnes' 21-page report draw similar conclusions, during the hearing and in the revised proffer such obvious attacks on the credibility of the witnesses have been muted.

### Other Jurisdictions

The parties have cited decisions from around the country to support their positions.[22]  *In Vermont v. Wigg*,[23]  the Supreme Court found "a large majority of courts have held that the type of general expert evidence introduced in this case, explaining the proper and improper methods of examining children who may be victims of sexual assault, is admissible."[24]  There, the trial court permitted some

---

[20] Def. Resp., Ex. B, at 140.

[21] 2022 WL 3211004 (Del. Super.).

[22] Defendant cites in a footnote along with other cases to *New Jersey v. Michaels*, 642 A.2d 1372 (N.J. 1994), but that case is over thirty years old, and the procedural posture is not terribly helpful here.  That said, the decision highlights issues with "coercive or highly suggestive interrogation techniques [that] can create a significant risk that the interrogation itself will distort the child's recollection of events…."  *Id.* at 1379.

[23] 889 A.2d 233, 238 (Vt. 2005).

[24] *Id.* at 239 (collecting cases).

testimony from the defense expert, but did not permit testimony regarding the interviewers' adherence to protocol or any impact their deviation from protocol might have on the child-witness's credibility.[25]  The state supreme court held it was appropriate to exclude the portion of expert testimony that a complainant's testimony is unreliable because of defects in the initial questioning.[26]  However, the court determined that the expert's assessing whether interview tactics were within protocol did not constitute commenting on the witnesses' credibility.[27]

*Kansas v. Huntley*[28] is not entirely helpful, as it dealt with a continuance request to hire a potential expert.  That said, the decision suggests caselaw trended toward permitting expert testimony "on the impact of suggestive interviewing techniques on child witnesses."[29]

Mr. Green also cites *Montana v. Colburn*, a decision from the Montana Supreme Court reversing the trial court for not permitting expert testimony on forensic interviewing.[30]  *Colburn* is distinguishable for two reasons; first, the expert was excluded by the trial court because she was not trained on a particular interview protocol—which is not factually analogous to our case.[31]  Second, the Montana

---

[25] *Id.* at 238.
[26] *Id.* at 239 (collecting cases).
[27] *Id.* at 241–42.
[28] 177 P.3d 1001 (Kan. Ct. App. 2008).
[29] *Id.* at 1008 (citations omitted).
[30] 366 P.3d 258 (Mont. 2016).
[31] *Id.* at 261.  This was also the thrust of the decision by the South Dakota Supreme Court case cited by the defense, *South Dakota v. Wills*, 908 N.W.2d 757 (S.D. 2018).

Supreme Court made it clear that its trial courts are to "construe liberally … so as to admit all relevant expert testimony…."[32]  As noted above, our Supreme Court has reiterated the gatekeeping role of this Court.[33]

The Ohio Supreme Court has determined defendants in child sexual abuse cases "may present testimony as to the proper protocol for interviewing" children.[34] In a later decision, *Ohio v. Pryor*, the court of appeals found no error in denying a defense request for an expert where the trial court concluded there was no issue with whether the protocols were followed by the interviewer.[35]

*Oregon v. Black*[36] addressed some of the arguments advanced by the State in this case.  But the decision itself focused on whether the proposed testimony was improper vouching.  The Court did not make a *Daubert* assessment.

*New Hampshire v. Sargent*[37]  is also distinguishable.  In that case, the State introduced expert testimony about child sexual abuse accommodation syndrome in its case in chief.  As rebuttal, the defense sought to offer an expert to opine "on the danger of improperly-conducted interviews of children."[38]  The court acknowledged a split in decisions with regard to whether such testimony was "within the knowledge

---

[32] 366 P.3d 258, 260 (quotation omitted) (citation omitted).
[33] *In re Zantac (Ranitidine) Litigation*, 342 A.3d 1131, 1135 (Del. 2025).
[34] *Ohio v. Gersin*, 668 N.E.2d 486, 487 (Ohio 1996).
[35] *Ohio v. Pryor*, 2004 WL 251659, at *1–3 (Ohio Ct. App.).
[36] 437 P.3d 1121 (Or. 2019).
[37] 738 A.2d 351 (N.H. 1999).
[38] *Id.* at 352.

and understanding of the average juror."[39]  The New Hampshire Supreme Court found it was expert testimony but also held "[t]here must be a particularized showing that improper interview techniques were used, however, before a party can introduce expert testimony."[40]

Similarly, the Georgia Supreme Court has determined it is appropriately within the scope of expert testimony to "provid[e] the jury with information about proper techniques for interviewing children and whether the interviewing techniques actually utilized were proper."[41]  A particular concern for that court was that the State's witness was permitted to testify regarding his "extensive experience and training in investigating child sexual abuse and interviewing the victims thereof."[42] The exclusion of the defense expert created an "uneven playing field."[43]  The trial court can exclude expert testimony that is "not based upon either the facts within the expert's knowledge or other facts admitted in evidence."[44]

Wisconsin's Court of Appeals has examined this issue and found "in some cases, it may be an erroneous exercise of discretion to deny an indigent defendant's request for permission to hire an expert for testimony on the issue of suggestive

---

[39] *Id.* at 354 (collecting cases).
[40] *Id. citing Wisconsin v. Kirschbaum*, 535 N.W.2d 462, 466–67 (Wis. Ct. App. 1995).
[41] *Barlow v. Georgia*, 507 S.E.2d 416, 417 (Ga. 1998).
[42] *Id.* at 418.
[43] *Id.*
[44] *Id. citing Lane v. Georgia*, 479 S.E.2d 350 (Ga. Ct. App. 1996).

interview techniques used with a young child witness."[45]  However, the defense did not provide "a single specific example of an improper interview technique that her expert would discuss such that the court could invoke its decisional process."[46] Arizona has determined a properly qualified expert may testify, but such testimony is "properly limited to explaining to the jury the dangers of contaminated memories and suggestive practices when interviewing children and discussion of the particular practices employed in the instant case."[47]

Missouri's Court of Appeals dealt with this issue, but the context within which that case was decided indicates the State offered its interviewer as an expert.[48]  The court found that the defendant's expert would testify that the questions asked by the State's interviewer were inappropriate.  The court found this was, indeed, expert testimony.  The same was true in *Florida v. Malarney*, which held "it is not necessarily equally improper for a defendant to show that the interviewing techniques and procedures of the abuse treatment experts played a role in planting a story into a young, impressionable child's mind."[49]

In contrast to these cases is the Supreme Court of Maine's determination that testimony regarding children's susceptibility to suggestive questions was not expert

---

[45] *Kirschbaum*, 535 N.W.2d at 467.
[46] *Id.*
[47] *Arizona v. Speers*, 98 P.3d 560, 567 & n.3 (Ariz. Ct. App. 2004).
[48] *State v. Sloan*, 912 S.W.2d 592, 596 (Mo. Ct. App. 1995).
[49] 617 So. 2d 739, 741 (Fla. Dist. Ct. App. 1993).

testimony.[50]  The Supreme Court of Washington in *Washington v. Willis* reached a nuanced decision, finding "merely because it is a matter of general knowledge that children's memories are changeable does not preclude testimony that specific interview techniques might compromise specific memories."[51]  In *Willis*, the court found the expert's opinion critiquing the interview was "highly equivocal, it did nothing to help the trier of fact evaluate [the child's] most critical testimony…."[52]

### *Analysis*

The review of decisions from around the country suggests the inquiry is intensely fact specific.  Without making a blanket determination on the admissibility of such testimony, this Court finds the proffered testimony of Dr. Byrnes is not tied to any objective measure or standard and has concerns related to its relevance and reliability.  While not dispositive, this proffered expert has never been accepted by any court, in any jurisdiction, to provide expert testimony on forensic interviewing.

Further, it is unclear to the Court why Dr. Byrnes' review of this case was limited to only certain interviews and videos.  Dr. Byrnes was aware she did not have the full picture, and yet that fact did not qualify her criticisms.  Her opinions are based on a record that is limited without any logical basis—which calls into question several of her conclusions related to rapport-building or establishing rules for the

---

[50] *Maine v. Ellis*, 669 A.2d 752, 753 (Me. 1996).
[51] 87 P.3d 1164, 1167 (Wash. 2004) (en banc).
[52] *Id.* at 1168.

interview, as those may have been addressed in prior interviews. For example, Dr. Byrnes states "[i]t is important to highlight [] at this point in the series of forensic interviews, though[,] Ms. Coronado deviated markedly from the ChildFirst [e.g. no ground rules, no promise to tell the truth, no scaffolding of discussion, direct inquiry about private parts]."[53] But, Dr. Byrnes did not see the initial interviews of either child to determine whether those items had been covered. The Court finds her opinion is not based on sufficient facts or data under *Daubert*.

Second, her testimony on cross-examination revealed many of her criticisms of the interviewers in this case are, in fact, allowed by the ChildFirst protocol. For example, Dr. Byrnes is critical that multiple interviews took place. But, during cross-examination, she acknowledged that the APSAC guidelines on forensic interviews states "the number of interviews should be governed by the number necessary to elicit complete and accurate information from the child." Despite her opinion that the interviewers in this case did not establish ground rules, Dr. Byrnes later testified an interviewer is not supposed to go through the entire protocol each time they meet with a child.[54] Similarly, her testimony related to contamination was clarified to indicate she had no basis to believe these interviews were contaminated, only that they were *possibly* contaminated. The Court finds this testimony does not

---

[53] Report of Dr. Byrnes, State's Mot. *in Limine*, Ex. A, at 18.
[54] During her testimony on January 9, 2026.

meet the standard, by a preponderance of the evidence, that Dr. Byrnes reliably applied the principles and methods to the facts of this case or that her testimony on these issues is relevant.

It is not necessarily that such testimony is not within the realm of proper expert opinion—that determination is fact-specific. Here, the Court finds the testimony of this particular expert—as it pertains to the methodology applied to the limited interviews she reviewed in this case—does not meet the standards of relevance and reliability such that it should be heard by the jury.

Because the Court's concerns are specific to Dr. Byrnes opinions related to the interviews in this case and there appears to be no challenge to her qualifications—the Court will consider permitting her testimony as to the ChildFirst protocols/forensic interviewing techniques and the underlying rationale for those protocols. She may testify regarding concerns with questions that are (1) repeated, (2) leading, (3) problematically phrased, (4) forced choice, and (5) the importance of limiting exposure to information. Dr. Byrnes may explain to the jury the importance of developmentally inappropriate language as well as confirmatory bias on the part of the interviewer. To be clear, if called as a witness, Dr. Byrnes may not testify as to the credibility of the children (directly or indirectly), and she will not be permitted to testify as to her analysis of the CAC interviews in this case for the reasons cited above.

The State's Motion *in Limine* is therefore, GRANTED, in part.

**IT IS SO ORDERED.**


**/s/Sonia Augusthy**
Judge Sonia Augusthy