RENDERED: APRIL 22, 2010
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2007-SC-000248-DG

DATE 5-13-10 EIA Growth, P.C.

JOHN TIM JENKINS                                     APPELLANT


                    ON REVIEW FROM COURT OF APPEALS
V.                  CASE NO. 2006-CA-000158-MR
        WOODFORD CIRCUIT COURT NOS. 04-CR-00005 & 04-CR-00034


COMMONWEALTH OF KENTUCKY                             APPELLEE


              **OPINION OF THE COURT BY JUSTICE SCHRODER**

                    **REVERSING AND REMANDING**


Through this appeal, we recognize the admissibility of expert testimony regarding suggestive interviewing techniques which can affect the reliability or accuracy of a child witness's memory or recall. Consequently, because significant evidence of improper methods existed in this case, the trial court erred in denying the defense's request to call an expert witness on the subject. Therefore, we reverse the conviction and remand for a new trial consistent with this opinion.

In 2001, Appellant, John Tim Jenkins, a married father of three, became a volunteer with the Central Kentucky Big Brothers program. At the time, Jenkins was the Engineering Manager at the Osram Sylvania plant in Versailles, Kentucky. Jenkins testified that he had been a Big Brother, and his

wife a Big Sister, many years earlier (before they had their own children), and had enjoyed it. Jenkins testified that with his son leaving for college, and his wife and two teenage daughters involved in dance (and not interested in going to ballgames), he decided to get involved with Big Brothers again.

Jenkins completed the extensive Big Brothers application and screening process, and was matched with a "little brother," J.S., then six years old, in September, 2001. J.S.'s parents were divorced. J.S. lived with his mother in Woodford County, Kentucky, during the school year, and spent summers with his father in Georgia. As his Big Brother, Jenkins would do various activities with J.S., including taking him to ballgames, bike riding, swimming, and to the movies. J.S. would also occasionally eat dinner at the Jenkins' home with Jenkins and his wife and family. As part of Big Brothers' standard procedure, periodic reviews were conducted with J.S. and his mother, concerning the match with Jenkins. Neither J.S. nor his mother ever expressed any concerns. In the reviews, the mother reported that J.S. talked about Jenkins a lot and looked forward to their activities together, that J.S. had fun with Jenkins, and that J.S. would be happy and excited after returning from his activities with Jenkins. Jenkins had been J.S.'s Big Brother for two years, with no concerns.

The questionable events giving rise to this case began after work on October 8, 2003, when Jenkins took J.S, then eight years old, and his friend B.F., then six years old, on a planned swimming outing at the Falling Springs Arts and Recreation Center in Versailles, Kentucky. Jenkins and the boys

arrived at approximately 7:15 p.m. Jenkins and the boys first swam in the smaller pool (the Center has two pools). Brittany King and Megan Davenport, two lifeguards on duty, became suspicious of the way Jenkins was playing with the boys, in that he was swimming up under them and lifting them up out of the water. King also thought it looked like Jenkins was "nibbling on their thighs." King asked her supervisor, Greg Shanks, to observe. Shanks watched Jenkins and the boys, and saw nothing of concern.

Nevertheless, King and Davenport continued to watch the three attentively. After the three went to the big pool, King and Davenport again observed Jenkins swimming up under the boys and lifting them out of the water. They also thought Jenkins was kissing the boys on their faces and legs. While the three were playing in the pool, there was another family in the pool, the swim team and dive team were also practicing, and people were watching from the bleachers. No one else expressed any concern about Jenkins and the boys.

King and Davenport also expressed their concerns to the head lifeguard, Roger Maybrier. Maybrier looked in on Jenkins and the boys in the pool. He recognized that the three were playing a game of "shark" or "alligator," where one person pretends to be the shark or alligator, and the others try to swim across the pool without getting "eaten." Maybrier was not concerned.

When the three were finished swimming, Shanks followed them into the locker room. Jenkins and J.S. were using the shower in the handicapped

shower stall, and B.F. was in the adjoining shower stall. The shower curtain was not completely drawn, so Shanks looked into the shower. He could see that Jenkins and J.S. were naked. Shanks did **not** see any physical contact between the two. Shanks went to get Maybrier, and when the two came back, B.F. had joined Jenkins and J.S. in the handicapped shower. Again, the curtain was not all the way closed, and both looked in. J.S. was sitting on the floor of the shower, B.F. was on one side of the shower, and Jenkins was on the other side. They looked into the stall several times but never saw any physical contact between Jenkins and either boy. Maybrier and Shanks decided to let Jenkins know someone was in there, by being loud and opening and closing lockers.

When the water stopped, B.F. came out of the shower first. Shanks asked who he came with. B.F. said Jenkins was "Big Brother Big Sister." Shanks asked B.F. if he was having a good time, and he said he was. Because Jenkins was not a relative, Shanks and Maybrier suspected that something "fishy" was going on, and called the police.

Police officers arrived at the pool at approximately 8 p.m., and immediately separated Jenkins from the boys. Six-year-old B.F. was driven home in a police car and turned over to his mother. Eight-year-old J.S. was taken in a police car to the Versailles Police Department. Detective Rick Qualls was on call, and arrived at the Versailles police station at approximately 10:30 p.m. When Qualls arrived, J.S., scared and crying, was sitting in the break

4

room. Because the break room was noisy, Qualls decided to have J.S. transported to the Woodford County police station, where it would be quieter. J.S. was again taken in a police car, to the Woodford County police station, arriving at about 11:00 p.m. J.S. was scared and wanted his mother. A social worker and J.S.'s mother arrived shortly thereafter. Qualls informed the mother that he was concerned J.S. may have been sexually abused because of the lifeguards' suspicions, and because Jenkins had been reported nude in the shower with J.S. Qualls basically testified that he thought he knew what happened but that he needed to hear it from J.S.

Detective Qualls was not specialized in interviewing children. Qualls began interviewing eight-year-old J.S. around **midnight**. His mother was not allowed to be present during the interview. For the first half-hour, J.S. denied that Jenkins had done anything sexually inappropriate.[1] Qualls would not accept J.S.'s denials, and would not let him go home. After unrelenting and suggestive questioning, J.S., who had been to school that day and was very

---

[1] For example:

> Qualls (referring to J.S. and Jenkins being in the shower): And did you touch his private parts?
>
> J.S.: No.
>
> Qualls: Did he touch your private parts?
>
> J.S: No.
>
> Qualls: What about when you were in the pool and you all were swimming?
>
> J.S.: No.
>
> Qualls: No? Someone told me that there may have been some touching there.
>
> J.S.: No.

tired, finally agreed with Qualls' suggestion that he had been touched once.[2] Qualls ended the interview around 1:30-2:00 a.m. and released J.S. to his mother. Much of the interview was tape recorded. The next morning, Qualls and the social worker visited J.S. at his home for a second interview, which was tape recorded as well. J.S. agreed with Qualls' suggestion that there was a second touching. On January 7, 2004, a four-count indictment was returned against Jenkins.[3] The indictment charged two counts of first-degree sexual abuse of J.S., and two counts of indecent exposure for showering in the nude in the presence of J.S. and B.F.

Following the allegations of October 8, 2003, J.S. was put into sex abuse therapy. J.S. saw a therapist at least once a week, and attended group therapy as well. On March 1, 2004, J.S. was taken to the Children's Advocacy Center, where he was interviewed by a forensic interviewer. Based on statements elicited in this interview, a second indictment was returned charging Jenkins with two counts of sodomy.[4] The indictments were consolidated for trial.

At trial, the defense proposed to call Dr. Terence Campbell, a forensic psychologist, to testify concerning improper interviewing techniques which can result in unreliable reporting by child witnesses. Dr. Campbell had reviewed

---

[2] Even though J.S. had denied any inappropriate touching up to this point, he was not given the option of "none": only once or more than once.

> Qualls: You touched him just once. He touched you just once or has it been more than once.
>
> J.S.: Once.

[3] No. 04-CR-00005

[4] No. 04-CR-00034

all of the discovery provided by the Commonwealth, including the interviews of J.S. He had prepared a lengthy report, and was prepared to testify as an expert witness that improper methods were used in this case. The Commonwealth objected to Dr. Campbell's proposed testimony. The trial court held an extensive *Daubert*[5] hearing on the matter. Dr. Campbell testified at length, both as to his qualifications as an expert, and as to the scientific acceptance of the principle that suggestive interviewing techniques can affect the reliability or accuracy of a child's memory or recall. Then, Dr. Campbell analyzed the interviewing techniques used in this case, pointing out serious improprieties.

Following the *Daubert* hearing, the trial court agreed with the Commonwealth's objection to Dr. Campbell's testimony under a belief that, notwithstanding compliance with *Daubert*, Kentucky law prohibited this type of testimony. Because the trial court would not allow Dr. Campbell to testify, the defense requested that the tape of the interviews be played for the jury, so that the jury could decide if the allegations were made by J.S., or only in response to prompting and suggestions by Qualls. The Commonwealth objected to the playing of the tape, and the trial court sustained the Commonwealth's objection.

The trial court granted a directed verdict on the indecent exposure charge involving B.F. Jenkins was found guilty of one count of first-degree sexual abuse of J.S., allegedly occurring on October 8, 2003, at Falling

---

[5] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Springs, and one count of indecent exposure, as to J.S., in the shower at Falling Springs; and not guilty of all remaining charges. The trial court sentenced Jenkins, in accordance with the jury's recommendation, to five years on the sexual abuse conviction, and a $250 fine for indecent exposure.

Jenkins appealed his convictions to the Court of Appeals on a number of grounds. The Court of Appeals held that Dr. Campbell's testimony was not precluded by Kentucky law, and remanded to the trial court to make findings under KRE 702. The Court of Appeals rejected the other errors. Jenkins moved for discretionary review, which we granted.[6] The issues before this Court are: the admissibility of expert evidence of suggestive interview techniques with children; the admissibility of the interview tapes; and the sufficiency of the evidence to support the indecent exposure conviction. Because we are remanding for a new trial, the remaining issues are moot.

## ADMISSIBILITY OF EXPERT TESTIMONY

Jenkins contends that the trial court erred in prohibiting his expert from testifying at the trial regarding the suggestive interviewing procedures used in this case. As stated earlier, the defense attempted to call Dr. Terence Campbell, a highly qualified forensic psychologist, to provide expert testimony on the scientific principle that improper interviewing practices can result in

---

[6] The trial court held a full *Daubert* hearing, and there is a fully developed record on this issue sufficient for appellate review of admissibility under KRE 702. Therefore, a remand for the purpose of further findings was not necessary. *Miller v. Eldridge*, 146 S.W.3d 909, 922 (Ky. 2004); *Commonwealth v. Christie*, 98 S.W.3d 485 (Ky. 2002). The Commonwealth does not contend that a remand was necessary.

unreliable allegations, and the improper practices which were used in this case.

KRE 702 allows a qualified expert to testify in the form of an opinion or otherwise with respect to scientific, technical, or other specialized knowledge, provided that the testimony is scientifically reliable and will assist the trier of fact to understand the evidence or to determine a fact in issue. This requires a trial court to make a preliminary determination that the evidence is both relevant and reliable. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 578 (Ky. 2000). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-94 (1993), the United States Supreme Court set forth a non-exclusive list of factors to be considered when assessing the reliability of an expert's proferred testimony: (1) whether a theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and (4) whether the technique enjoys general acceptance within the relevant scientific, technical, or other specialized community. *Goodyear*, 11 S.W.3d at 578-79; *see also Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 39-40 (Ky. 2004).

The trial court held a *Daubert* hearing on Dr. Campbell's proposed testimony. Dr. Campbell first testified to his qualifications.[7] Dr. Campbell had

---

[7] Dr. Campbell testified that he received his Ph.D. in Human Development and Clinical Psychology from the University of Maryland in 1970, and completed an internship in clinical psychology at the National Institute of Mental Health in Washington, D.C. Since 1970, he has

prepared a thirty-eight page report which outlined the scientific principles upon which he relied, and application of such to the interviews in this case, which was entered as an exhibit by avowal. For purposes of this opinion, we summarize Dr. Campbell's testimony at the *Daubert* hearing, and his lengthy report: It is not only generally, but "absolutely", accepted in the psychological community that young children are highly susceptible to suggestion, and that improper interviewing methods create a serious risk of unreliable responses and inaccurate recall, including false allegations of sexual abuse. Improper interviewing techniques include interviewer bias, leading or suggestive questions, coercive or "forced-choice" questions, repeated questions, and repeated interviews.[8] A child's memory and recall can become profoundly

---

researched and studied extensively in the area of human memory and recall, with emphasis in the area of proper and improper questioning methods of children with regard to sexual abuse allegations. Dr. Campbell has authored or co-authored five books related to forensic psychology. He has authored or co-authored at least forty peer-reviewed articles in the area of forensic psychology in general, and at least half a dozen peer-reviewed articles in the specific area of suggestive interview techniques in child abuse cases, which have been published in various professional and scientific journals. Dr Campbell acknowledged that he has been recognized as an expert on the subject matter at issue in courts throughout the United States and his testimony thereon admitted under the *Daubert* standard.

[8] Detective Qualls went into the interview assuming that J.S. had been molested and seeking to confirm this assumption. He would not accept J.S.'s denials as the truth. Qualls responded favorably to J.S. when he would agree with what was suggested.

Dr. Campbell explained:

> Investigative interviews can go astray when they respond to interviewer bias pursuing one hypothesis and one hypothesis alone. Under no circumstances [can interviewers] resort to suggestive questions asked repeatedly. And when you start directing variations of the same question to a child and asking those question variations time and time again, you send a message to the child that says I'm less than enthusiastic with how you are answering this question. That's how children will interpret it. And the child's interpretation is I've got to get this right, and to get this right I have to change my answer. And under those circumstances, without intending to, with no

distorted by such techniques. Once a child's memory has become distorted in this way, rehabilitation through a later, proper interview is nearly impossible. Dr. Campbell explained:

> [Rehabilitation] is very, very unlikely because what happens, when children are interviewed in a biased, leading manner, [they] experience [what are] called source monitoring problems[.] [T]he source monitoring problems refer to the inability of the child to accurately discriminate between on the one hand events that are accurately recalled, versus on the other hand events that are only imagined. So what happens is inappropriate biased interviews suggest events to children that they imagine. The more the children are asked about these imaginary events, the more the child visualizes the imaginary events. The more the child imagines these imaginary events, the more familiar the events become. As events become more familiar, the child becomes genuinely and sincerely convinced that he is reporting accurate recall when in fact all he is doing is describing imaginary events that have been suggested to him via repeated leading suggestive questions.[9]

Dr. Campbell testified that the aforementioned principles are based on accepted science in the field of human memory and recall. The principles are supported by longstanding and unanimous scientific research, can be and have

---

premeditated malice whatsoever, an interviewer can lead a child into confirming the interviewer's apriori expectations that the interviewer took into the interview.

[9] Because the child truly believes the suggested version, cross-examination of a child whose memory has been affected by suggestive interviewing is ineffective. *See, e.g., State v. Sargent,* 738 A.2d 351, 353 (N.H. 1999) ("Furthermore, if a child witness sincerely believes that the suggested sexual abuse actually occurred, cross-examination of that child witness may not effectively test the reliability of the child's recollection."); *Barlow v. State,* 507 S.E.2d 416, 418 (Ga. 1998) (recognizing that cross-examination may be ineffective where child sincerely believes false recollections); *State v. Kirschbaum,* 535 N.W.2d 462, 467 (Wis. Ct. App. 1995) ("[C]ross-examination of a child witness could be ineffectual if the child sincerely takes his or her recollections to be grounded in facts and does not remember the improper interview procedures which may have suggested them.").

11

been empirically tested, and continue to be supported by accumulating laboratory data. The principles have been subjected to peer review and publication, and are not only generally, but *emphatically*, accepted in the psychological community, and have been for years. Dr. Campbell's report, entered as an exhibit to the *Daubert* hearing, expanded upon his testimony, and included extensive citation to peer-reviewed research and specific studies (and the methodology employed therein) and how the studies illustrated the principles to which he testified.

Dr. Campbell then proceeded to apply these accepted principles to the interviews in this case. Because this case is being remanded for retrial, it is sufficient to say that, in his review of the interviews, Dr. Campbell identified numerous instances of improper techniques, including interviewer bias, and suggestive, leading, repeated, coercive and forced-choice questioning.

Following the hearing, the trial court ruled that, *Daubert* notwithstanding, it did not believe that expert testimony of improper or suggestive questioning of children was admissible in Kentucky, on grounds that its purpose would be to show that a witness was not being truthful, which would be an improper comment on credibility. It is well established that the credibility of witnesses, including children, is a matter for the jury. *See Estep v. Commonwealth*, 957 S.W.2d 191, 193 (Ky. 1997). Credibility refers to whether a witness is being truthful or untruthful. The proferred expert testimony did not run afoul of this rule. Similar to expert testimony involving

12

eyewitness identification, expert testimony that a witness was subjected to suggestive interview techniques pertains to the *reliability* or *accuracy* of the witness's belief or recollection, not to the truthfulness or untruthfulness of the witness. *Cf. Commonwealth v. Christie*, 98 S.W.3d 485 (Ky. 2002) (expert eyewitness identification testimony). To the contrary, such evidence *assumes the witness is testifying truthfully* - but may be mistaken in his or her belief. Accordingly, the trial court erred in ruling the evidence was inadmissible as a matter of law.

The Court of Appeals correctly noted that the analysis is simply whether the expert evidence is admissible under KRE 702. While this Court has not had occasion to consider the admissibility of expert testimony on improper interviewing techniques, numerous other jurisdictions which have done so recognize expert testimony in this area be admissible.[10] *See, e.g., Barlow v. State*, 507 S.E.2d 416 (Ga. 1998) (defendant in child molestation case entitled to introduce expert testimony as to proper techniques for interviewing children and whether the techniques actually utilized were proper); *State v. Gersin*, 668 N.E.2d 486 (Ohio 1996) (trial court erred in refusing to admit expert testimony regarding established protocols for interviewing children); *State v. Sloan*, 912 S.W.2d 592 (Mo. Ct. App. 1995) (reversible error for trial court to exclude

---

[10] In *Stringer v. Commonwealth*, we held that the trial court did not err in excluding expert testimony on suggestibility, because there was no evidence that any suggestive or improper interview practices occurred. Hence, the testimony was irrelevant. 956 S.W.2d 883 (Ky. 1997). In *Pendleton v. Commonwealth*, we held, applying the *Snodgrass* factors, that the trial court did not err in denying a last minute continuance in order for a defendant to obtain an expert witness on suggestibility. 83 S.W.3d 522 (Ky. 2002). *Pendleton* did not hold that such testimony was inadmissible.

expert testimony on unreasonably suggestive interview techniques and methods); *United States v. LeBlanc*, 45 F. App'x 393 (6th Cir. 2002) (recognizing same Dr. Campbell's testimony met *Daubert* standard); *State v. Wigg*, 889 A.2d 233, 239 (Vt. 2005) ("[A] large majority of courts have held that the type of general expert evidence introduced in this case, explaining the proper and improper methods of examining children who may be victims of sexual assault, is admissible."); *State v. Speers*, 98 P.3d 560, 562 (Ariz. Ct. App. 2004) ("[T]he trial court erred by refusing to allow Defendant to present expert testimony on the subject of the proper protocols for interviewing young children to avoid suggestiveness and the implanting of false memories."); *Commonwealth v. Delbridge*, 855 A.2d 27 (Pa. 2003) (recognizing possible compromise of child witness testimony due to suggestive questioning); *State v. Michaels*, 642 A.2d 1372, 1384 (N.J. 1994) ("Experts may thus be called to aid the jury by explaining the coercive or suggestive propensities of the interviewing techniques employed . . . ."); *State v. Sargent*, 738 A.2d 351 (N.H. 1999) (permitting expert testimony on the possibility of false memory implantation in children through improper and suggestive interview techniques); *State v. Kirschbaum*, 535 N.W.2d 462, 466-67 (Wis. Ct. App. 1995) (recognizing utility of expert testimony on suggestive interview techniques which can undermine the reliability of a child's account of events).

Having reviewed the extensive record in this case, including the *Daubert* hearing and Dr. Campbell's report, we opine the trial court erred in excluding

his testimony. KRE 702. Dr. Campbell was eminently qualified to testify as to the subject matter (his qualifications were undisputed). Dr. Campbell's uncontroverted testimony and lengthy report clearly satisfied the *Daubert* standard to establish the scientific reliability of the principle that suggestive interviewing techniques can affect the reliability or accuracy of a child's memory or recall. In fact, the Commonwealth does not dispute the scientific reliability of Dr. Campbell's proposed testimony on appeal.[11] Dr. Campbell's testimony was highly relevant, as there was significant evidence that improper interviewing practices were used in this case. *Stringer v. Commonwealth* held it was not error for the trial court to exclude the same Dr. Campbell's testimony on grounds that the interviews were not recorded, and, without the interviews, it would be mere speculation to conclude the interview techniques were improper. 956 S.W.2d 883, 892 (Ky. 1997). Hence, in *Stringer*, the expert testimony was not relevant. *Id.* As the Court of Appeals recognized, this case does not have the impediment of *Stringer*, because in this case, the interviews were recorded. Dr. Campbell was able to review the recorded interviews, and apply the science directly to the interviews. Finally, we conclude, as have many of our sister states, that the testimony would assist the trier of fact, as the theories and principles are not within the knowledge of the average juror.

---

[11] The Commonwealth in its brief before this Court agrees that Dr. Campbell could "testify that certain studies have shown that improper questioning techniques, i.e., leading questions, can result in unreliable reporting of sexual abuse by child witnesses." However, the Commonwealth objects to Dr. Campbell's testifying that he reviewed the transcripts of the interviews and that improper methods were, in fact, used upon J.S. in this case. Per *Stringer*, however, it is the application of the principles to the facts of the case that makes the expert's testimony relevant. *Stringer*, 956 S.W.2d at 892.

15

*See Barlow*, 507 S.E.2d at 417-18 (recognizing that effect of interviewing techniques on children is a subject not within knowledge of a lay juror); *State v. Huntley*, 177 P.3d 1001, 1008 (Kan. Ct. App. 2008) (recognizing that proper protocols and interview techniques for children is a matter not within knowledge of average juror); *Sloan*, 912 S.W.2d at 597 ("However, the crux of [the expert's] testimony was intended to show that a substantial portion of the questions asked by [the detective] . . . were 'inappropriate.' This represents evidence only an expert could give on matters not within the knowledge of a juror.") (footnote omitted); *Sargent*, 738 A.2d at 354 ("Instead, we agree with those jurisdictions that find that the proper protocols and techniques used to interview child victim witnesses is a matter not within the knowledge and understanding of the average juror."); *Gersin*, 668 N.E.2d at 488 ("Most jurors lack the knowledge of accepted practices in interviewing child victims, and expert testimony on the issue is therefore admissible."); *Kirschbaum*, 535 N.W.2d at 467 (how improper interview techniques may have affected reliability of child's recollections is a subject with which a lay juror may be unfamiliar).

Accordingly, the trial court erred in not allowing Dr. Campbell to testify as to the suggestive interview techniques used in this case. There was no evidence of sexual abuse, other than allegations which occurred only after highly suggestive interviews conducted by the untrained Detective Qualls. Accordingly, the error is not harmless, and we must reverse and remand for a new trial.

## ADMISSIBILITY OF INTERVIEW TAPES

When the trial court would not allow Dr. Campbell to testify, the defense sought to introduce the tape recordings of Detective Qualls' interviews with J.S., through Detective Qualls on cross-examination. The Commonwealth objected on hearsay grounds. The defense explained that it was not offering the recordings for the truth of the matter asserted therein (that the statements made by Qualls and J.S. on the tapes were true) but for the non-hearsay purpose of showing the suggestive and coercive manner in which the interviews were conducted, and as proof of the unreliability of the allegations by showing that they arose not from J.S., but as a result of suggestions and prompting by the detective.

The trial court erred in not allowing the tape recordings to be introduced. The taped interviews were not being offered for the truth of the matter asserted, nor to impeach J.S. The tapes were offered as proof that the investigation was flawed from the very beginning, by showing the coercive and suggestive manner in which the interviews were conducted and the allegations obtained. This is a proper, non-hearsay use. *See Norton v. Commonwealth*, 890 S.W.2d 632, 635 (Ky. App. 1994). On retrial, the recorded interviews would be admissible.

## INDECENT EXPOSURE

Jenkins was also convicted of indecent exposure, arising from testimony that he removed his clothing and was naked in the presence of J.S. in the shower at Falling Springs. Jenkins argues that the trial court should have

17

granted a directed verdict on this charge.

At the time of Jenkins' indictment, the indecent exposure statute read as follows: "A person is guilty of indecent exposure when he intentionally exposes his genitals under circumstances in which he knows or should know his conduct is likely to cause affront or alarm." KRS 510.150.[12] On a motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky. 1991). "On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.*

Viewing the evidence in the light most favorable to the Commonwealth, Jenkins, J.S., and B.F. entered the Falling Springs locker room after swimming to take a shower. Jenkins removed his swimming trunks, and showered in the same handicapped stall as J.S., who had also removed his trunks. B.F. had removed his trunks, and started showering in a different stall, but then joined Jenkins and J.S. in the handicapped shower. There was no evidence that Jenkins removed his swimming trunks for any purpose other than to take a shower and change clothes. In addition, the boys' testimony provided no evidence that the removal of Jenkins' swimming trunks had any effect on either of them. Indeed, the two employees who were watching the three in the shower

---

[12] The statute was amended post-indictment to differentiate between first- and second-degree indecent exposure based on the age of the victim. *See* 2004 Ky. Acts 190; KRS 510.148 (indecent exposure in the first degree); KRS 510.150 (indecent exposure in the second degree).

described the three as taking showers in the nude. Male nudity in a men's locker room with showers is certainly not unusual, and standing alone, it is not likely to cause affront or alarm, and is not a crime.

Because the Commonwealth did not present evidence that would prove all elements of indecent exposure, only nudity in a public shower, it would be clearly unreasonable for a jury to find guilt. Accordingly, the trial court erred in denying a directed verdict on this charge.

For the foregoing reasons, we reverse Jenkins' convictions and remand the case to the trial court for a new trial consistent with this opinion.

Minton, C.J.; Cunningham, Noble, Schroder, Scott, and Venters, JJ., sitting. All concur. Abramson, J., not sitting.

COUNSEL FOR APPELLANT:

J. Guthrie True
Samuel Ryan Newcomb
Johnson, True & Guarnieri, LLP
326 West Main Street
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General

David Wayne Barr
Assistant Attorney General
Office of Attorney General
Office of Criminal Appeals
1024 Capital Center Drive
Frankfort, KY 40601-8204